809 F.2d 1302
 55 USLW 2392, 1 Indiv.Empl.Rts.Cas. 1297
 Alan F. McDONELL, M. Lee Curran; and Sally Phipps,
Individually and on behalf of all others similarly
situated, Appellees,
v.
Susan HUNTER; Jean Sebek; Russell Behrends and Harold
Farrier, Appellants.
 No. 85-1919.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 12, 1986.
Decided Jan. 12, 1987.
Rehearing and Rehearing En Banc Denied Feb. 24, 1987.
 
 Mark Hunacek, Asst. Atty. Gen., Des Moines, Iowa, for appellants.
 Mark W. Bennett, Des Moines, Iowa, for appellees.
 Before LAY, Chief Judge, and ROSS and WOLLMAN, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 This is a class action challenging the constitutionality of an Iowa Department of Corrections policy under 42 U.S.C. Sec. 1983. This policy subjects the correctional institution employees to searches of their vehicles and of their persons, including urine, blood, or breath testing, upon the request of Department officials. The named plaintiffs are Alan McDonell, Lee Curran, and Sally Phipps. The certified class consists of all individuals employed by the Iowa Department of Corrections at its various institutions who are covered by the Department's search policy.
 
 
 2
 The district court[1] enjoined Department of Corrections officials and their agents from enforcing this search policy except in certain limited circumstances, unless the search is based upon a reasonable suspicion. We affirm the district court's order as herein modified.
 
 I. Facts
 
 3
 Plaintiff McDonell was employed as a correctional officer first at the Men's Reformatory at Anamosa (Anamosa) and later at another correctional institution. Plaintiffs Curran and Phipps, at all times material to this action, were employed at the Iowa Correctional Institution for Women at Mitchellville (Mitchellville).
 
 
 4
 Defendant Hunter is the Superintendent and chief executive officer of Mitchellville. Defendant Sebek is the Security Director of Mitchellville, and is responsible for the implementation and enforcement of the Department's policy. Defendant Behrends is the Acting Deputy Warden of Anamosa, and is responsible for the implementation of the Department's policy.[2] Defendant Farrier is Director and chief administrative officer of the Iowa Department of Corrections, and is responsible for the supervision and operations of Anamosa, Mitchellville, and other correctional institutions.
 
 
 5
 When McDonell was employed at Anamosa in 1979, he signed a consent to search form.[3] In January 1984 the supervisory personnel at Anamosa requested McDonell to undergo urinalysis because he had been seen with individuals who were being investigated for possible drug-related activities. McDonell refused and as a result his employment was terminated. Shortly thereafter he was reinstated with loss of ten days' pay and was transferred to another institution.
 
 
 6
 In August of 1983, employees at Mitchellville were presented a search consent form[4] to sign. Plaintiffs Curran and Phipps refused to sign. While there was disputed evidence that these employees were told that if they did not sign, they would not receive their paychecks, they did in fact receive paychecks and they have not been discharged or disciplined for refusing to sign.
 
 
 7
 Plaintiffs sought declaratory and injunctive relief on behalf of themselves and the class[5] they represented, claiming the policy[6] violates the fourth amendment to the United States Constitution and plaintiffs' constitutional right to privacy.
 
 
 8
 A preliminary injunction was issued in February 1984. On appeal it was affirmed. McDonell v. Hunter, 746 F.2d 785, 787 (8th Cir.1984). In July 1985, the district court issued its final order 612 F.Supp. 1122. The district court held that searches of correctional employees, including urinalyses, and of their vehicles may be made only on the basis of reasonable suspicion, with certain specified exceptions.[7] The district court found that the policy challenged here was designed to serve security requirements at the state's correctional facilities, but that the employees had legitimate, although diminished, expectations of privacy while in the correctional institution. The court balanced the state's interest in security against the infringement upon the individual employee's right to privacy and determined that reasonable suspicion, rather than probable cause, was the appropriate standard for conducting strip searches and urinalyses of employees. The district court order allows vehicle searches within the confines of the institution to be conducted uniformly or by systematic random selection. Searches of employees' vehicles within the institution's confines, other than uniformly or by systematic random selection were permitted only on the basis of a reasonable suspicion.
 
 II. Searches
 
 9
 The fourth amendment to the United States Constitution provides that:
 
 
 10
 [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 11
 The basic purpose of the fourth amendment, which is enforceable against the states through the fourteenth amendment, New Jersey v. T.L.O., 469 U.S. 325, 334, 105 S.Ct. 733, 739-40, 83 L.Ed.2d 720 (1985), is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 91967). The fourth amendment imposes a "standard of 'reasonableness' upon the exercise of discretion by government officials." Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). See also Illinois v. Lafayette, 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); Delaware v. Prouse, supra, 440 U.S. at 654, 99 S.Ct. at 1396.
 
 A. Strip Body Searches
 
 12
 Defendants argue that to maintain security and intercept contraband it is necessary that they be allowed to request strip searches of corrections officers based on mere suspicion. Defendants also argue that plaintiffs have no reasonable expectations of privacy within the institutions in light of their signing consent forms.
 
 
 13
 Correctional institutions are unique places "fraught with serious security dangers." Bell v. Wolfish, supra, 441 U.S. at 559, 99 S.Ct. at 1884. Within the walls of the correctional institution, "a central objective of prison administrators is to safeguard institutional security." Hunter v. Auger, 672 F.2d 668, 674 (8th Cir.1982). To achieve this goal prison administrators have the responsibility "to intercept and exclude by all reasonable means all contraband smuggled into the facility." Id.
 
 
 14
 In analyzing the intrusion on the individual's fourth amendment interests, there must be a legitimate expectation of privacy. To determine if an individual's expectation of privacy is legitimate, there must be both an actual subjective expectation and, even more importantly, Hudson v. Palmer, 468 U.S. 517, 525 n. 7, 104 S.Ct. 3194, 3199-3200 n. 7, 82 L.Ed.2d 393 (1984), that expectation must be one which society will accept as reasonable.[8] Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
 
 
 15
 While correction officers retain certain expectations of privacy, it is clear that, based upon their place of employment, their subjective expectations of privacy are diminished while they are within the confines of the prison. Security & Law Enforcement Employees, District Council 82 v. Carey, 737 F.2d 187, 202 (2d Cir.1984). We believe that society is prepared to accept this expectation of privacy as reasonable although diminished "in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons." Id.
 
 
 16
 The Supreme Court has held that warrantless searches "are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." Katz, supra, 389 U.S. at 357, 88 S.Ct. at 514. Exceptions have been made "where a legitimate governmental purpose makes the intrusion into privacy reasonable." Carey, supra, 737 F.2d at 203.
 
 
 17
 In light of the legitimate governmental interest in maintaining security at correctional institutions, it is our view, as it is that of the Second Circuit, that a reasonable suspicion standard should be adopted for strip searches of correction officers while working in correctional facilities. Id. at 204. As this court stated in Hunter v. Auger, supra, "[w]e believe that this standard is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers." Hunter v. Auger, supra, 672 F.2d at 674.
 
 
 18
 A reasonable suspicion standard has been upheld as the appropriate standard for conducting body searches of (1) prison visitors: Thorne v. Jones, 765 F.2d 1270, 1277 (5th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); Hunter v. Auger, supra, 672 F.2d at 674; (2) persons at the country's borders: United States v. Ogberaha, 771 F.2d 655, 658 (2d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); United States v. Asbury, 586 F.2d 973, 975-76 (2d Cir.1978); United States v. Afanador, 567 F.2d 1325, 1328 (5th Cir.1978); (3) arrestees: Jones v. Edwards, 770 F.2d 739, 741 (8th Cir.1985) (strip search conducted following arrest for animal leash law violation); Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) (strip search of one arrested for minor traffic offenses); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir.1983) (strip search of women arrested for misdemeanor offenses, done while women were awaiting arrival of bail money); and (4) prison guards: Security & Law Enforcement Employees, District Council 82 v. Carey, supra, 737 F.2d at 203-04; accord Armstrong v. New York State Commissioner of Corrections, 545 F.Supp. 728, 731 (N.D.N.Y.1982) (requiring "articulable facts" supporting belief that employee was concealing contraband on his person; cf. Gettleman v. Werner, 377 F.Supp. 445, 452 (W.D.Pa.1974) (reasonable suspicion found, but a federal court should "be reluctant to intervene" in prison administration matters).
 
 
 19
 The reasonable suspicion standard requires officials to base strip searches on specific objective facts and rational inferences they are entitled to draw from those facts in light of their experience. It requires individualized suspicion specifically directed to the person who is targeted for the strip search. Hunter v. Auger, supra, 672 F.2d at 674-75. Without reasonable, articulable grounds to suspect an individual employee of secreting contraband on his person, a strip search of that employee is unreasonable under the fourth amendment. We thus affirm the district court's order regarding strip searches of correctional facility employees.
 
 B. Urinalysis
 
 20
 Urinalysis has been determined to be a search and seizure within the meaning of the fourth amendment. Capua v. City of Plainfield, 643 F.Supp. 1507, 1513 (D.N.J.1986); Jones v. McKenzie, 628 F.Supp. 1500, 1508-09 (D.D.C.1986); Allen v. City of Marietta, 601 F.Supp. 482, 488-89 (N.D.Ga.1985); Storms v. Coughlin, 600 F.Supp. 1214, 1217 (S.D.N.Y.1984); In re Patchogue-Medford Congress of Teachers v. Board of Education, 119 A.D.2d 35, 505 N.Y.S.2d 888, 889 (1986); City of Palm Bay v. Bauman, 475 So.2d 1322, 1325-27 (Fla.Dist.Ct.App.1985); cf. Everett v. Napper, 632 F.Supp. 1481, 1484 (N.D.Ga.1986) (no search occurred and there was no fourth amendment violation where employee refused to take urinalysis test). In addition, the Third Circuit has implicitly held that the fourth amendment applies to urinalysis. Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir.1986).
 
 
 21
 In Allen v. City of Marietta, supra, and Capua, supra, the courts compared urine testing to the involuntary taking of a blood sample. "Though urine, unlike blood, is routinely discharged from the body so that no actual [physical] intrusion is required for its collection," both can be "analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came." Capua, supra, 643 F.Supp. at 1513. The Supreme Court has held that the involuntary administration of a blood test "plainly involves" the fourth amendment, which provides that " 'the right of the people to be secure in their persons * * * shall not be violated.' " (Emphasis added). Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966) (quoting the fourth amendment in part). We agree with those courts which have held that urinalysis is a search and seizure within the meaning of the fourth amendment.
 
 
 22
 Having determined that urinalysis is a search and seizure, we look to a balancing of "the need to search against the invasion which the search entails." Camara, supra, 387 U.S. at 537, 87 S.Ct. at 1735. Iowa Department of Corrections officials assert a strong need to see that prison guards are not working while under the influence of drugs or alcohol. Officials argue that prison security demands that those who have contact with inmates must be alert at all times. They also urge that the use of drugs by a correction officer is some positive indication that such officer may bring drugs into the prison for the use of the inmate.
 
 
 23
 Urinalysis properly administered is not as intrusive as a strip search or a blood test. While the prison officials have the same legitimate interest in maintaining prison security discussed supra, the infringement upon the privacy interest of correctional institution employees, already diminished, is lessened. Officials have a legitimate interest in assuring that the activities of those employees who come into daily contact with inmates are not inhibited by drugs or alcohol and are fully capable of performing their duties.
 
 
 24
 In Shoemaker v. Handel, supra, the Third Circuit upheld random selection by lot for urine testing of jockeys as well as daily breathalyzer testing. The court said the state had a "strong interest in assuring the public of the integrity of the persons engaged in the horse racing industry." Shoemaker v. Handel, supra, 795 F.2d at 1142. In approving this administrative search exception to the warrant requirement, the court looked first to a strong state interest in conducting an unannounced search and second, to a reduction in the justifiable privacy expectation of the subject of the search. Id. We believe the state's interest in safeguarding the security of its correctional institutions is at least as strong as its interest in safeguarding the integrity of, and the public confidence in, the horse racing industry. On December 1, 1986, the Supreme Court denied certiorari in this case, --- U.S. ----, 107 S.Ct. 577, 93 L.Ed.2d 580.
 
 
 25
 Warrantless searches of government employees have been found reasonable where the searches were directly relevant to the employee's performance of his duties and the government's performance of its duties. See United States v. Blok, 188 F.2d 1019, 1021 (D.C.Cir.1951); Allen v. City of Marietta, supra, 601 F.Supp. at 489-90, and cases cited therein. We agree with the Allen court that urinalyses are not unreasonable when conducted for the purpose of determining whether corrections employees are using or abusing drugs which would affect their ability to safely perform their work within the prison, "a unique place fraught with serious security dangers." Bell v. Wolfish, supra, 441 U.S. at 559, 99 S.Ct. at 1884. In our opinion the use of drugs by employees who come into contact with the inmates in medium or maximum security facilities on a regular day-to-day basis poses a real threat to the security of the prison. The only way this can be controlled in a satisfactory manner is to permit limited uniform and random testing. The least intrusive method of doing so is through use of urinalyses. In our opinion it is also logical to assume that employees who use the drugs, and who come into regular contact with the prisoners, are more likely to supply drugs to the inmates, although the trial court did not agree with this observation.
 
 
 26
 Because the institutional interest in prison security is a central one, because urinalyses are not nearly so intrusive as body searches, Shoemaker v. Handel, 608 F.Supp. 1151, 1158 (D.C.N.J.1985), aff'd, 795 F.2d 1136 (3d Cir.1986), and because this limited intrusion into the guards' expectation of privacy is, we believe, one which society will accept as reasonable, we modify the district court's order and hold that urinalyses may be performed uniformly or by systematic random selection of those employees who have regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons. Selection must not be arbitrary or discriminatory.
 
 
 27
 Urinalysis testing within the institution's confines, other than uniformly or by systematic random selection of those employees so designated, may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience that the employee is then under the influence of drugs or alcohol or that the employee has used a controlled substance within the twenty-four hour period prior to the required test. The demand for a urine, blood, or breath specimen should be made only on the express authority of the highest officer present in the institution, and the specific, objective facts should be disclosed to the employee at the time the demand is made. Strict guidelines should be established and followed to assure confidentiality of the results of urinalysis testing. Whether the testing is on the limited random basis approved above or on the basis of reasonable suspicion, the equipment and procedure to be used must provide sufficient guarantees of trustworthiness to permit the authorities to accurately determine the presence or absence of both drugs and alcohol in the urine. The equipment and procedure to be used shall conform to those described and approved by this court in Spence v. Farrier, 807 F.2d 753 (8th Cir.1986).
 
 
 28
 The trial court limited the right to test on reasonable suspicion to those employees who are "then under the influence of alcoholic beverages or controlled substances." We do not agree with this limitation and hold that urinalyses testing should also be permitted where there is a reasonable suspicion (as defined herein) that controlled substances have been used within the twenty-four hour period prior to the required test.
 
 
 29
 There was evidence that employees may have been asked to strip before giving a urine specimen, and there was some evidence submitted as to the reason for this requirement but it was not conclusive. We hold that the search policy should not require an employee to strip in connection with giving a urine or blood specimen. Other less intrusive measures can be taken to insure the validity of the specimen. We affirm the district court's order as to urine, blood, or breath specimens with the modifications set forth above.
 
 C. Vehicle Searches
 
 30
 The motor vehicle parking lot for employees at Mitchellville is within the area where inmates are confined. The parking lots at other correctional facilities are on property outside the area within which inmates are confined. Defendants argue that they have a significant interest in assuring that inmates do not have access to contraband hidden in vehicles.
 
 
 31
 The search of a vehicle is much less intrusive than a search of one's person. Almeida-Sanchez v. United States, 413 U.S. 266, 279, 93 S.Ct. 2535, 2542-43, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). Cases involving vehicle searches have recognized that an individual's expectation of privacy in his vehicle is less than in other property. United States v. Chadwick, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); United States v. Michael, 645 F.2d 252, 257 (5th Cir.) (en banc ), cert. denied, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981). Likewise, any expectation of privacy as to packages or containers within a vehicle is diminished. See United States v. Ross, 456 U.S. 798, 820 n. 26, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572 (1982). By the same balancing of individual rights against the interests of the correctional institution in maintaining security, we find that it is not unreasonable to search vehicles that are parked within the institution's confines where they are accessible to inmates. Such searches may be conducted without cause but must be done uniformly or by systematic random selection of employees whose vehicles are to be searched. It also is not unreasonable to search on a random basis, as described supra, employees' vehicles parked outside the institution's confines if it can be shown that inmates have unsupervised access to those vehicles. Any other vehicle search may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the vehicle to be searched contains contraband. We believe this is reasonable in light of Hudson v. Palmer, supra, in which the Supreme Court granted prison officials "unfettered access" to prisoners' cells as places where inmates can conceal contraband. Hudson v. Palmer, supra, 468 U.S. at 527, 104 S.Ct. at 3200. We affirm the district court's order as to vehicle searches with the above modifications.III. Consent Forms
 
 
 32
 Defendants argue that employees who signed consent forms have no legitimate expectation of privacy on correctional institution property.
 
 
 33
 If a search is unreasonable, a government employer cannot require that its employees consent to that search as a condition of employment. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 593-94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926). Armstrong v. New York State Commissioner of Corrections, supra, 545 F.Supp. at 731. A legal search conducted pursuant to voluntary consent is not unreasonable and does not violate the fourth amendment. Consent must be given voluntarily and without coercion determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973); United States v. Oyekan, 786 F.2d 832, 838 (8th Cir.1986). The district court here specifically made no finding as to the voluntariness of the signing of the consent forms. The district court did hold that "[a]dvance consent to future unreasonable searches is not a reasonable condition of employment." McDonell v. Hunter, 612 F.Supp. 1122, 1131 (S.D.Ia.1985). We agree. The state may only use a consent form which delineates the rights of the employees consistent with the views of this opinion and which does not require the waiver of any of those rights.
 
 
 34
 For the above reasons, the district court's order is affirmed as modified.
 
 
 35
 LAY, Chief Judge, concurring in part and dissenting in part.
 
 
 36
 I would affirm the decision of the district court in full.
 
 
 37
 I concur with the majority to the extent that it upholds the district court's application of the reasonable suspicion standard to employees of the state prison system. I do so because the district court made factual findings that justify application of that standard to strip searches and to requiring some employees to undergo urinalysis. However, to the extent that the majority sets aside the factual findings of the district court, substitutes assumptions which are not supported by the record, and modifies the district court's order, I respectfully dissent.
 
 
 38
 As the district court recognized, the fourth amendment's warrant requirement was established by the founders because of the colonists' bitter experiences with random searches conducted by authorities who believed that the interests of the monarch were paramount to the rights of individual citizens. See McDonell v. Hunter, 612 F.Supp. 1122, 1130 (S.D. Iowa 1985). When individual citizens who work for the state are told that to remain employed they must subject themselves to urinalyses and to vehicle searches because of the state's asserted security interests, without a demonstration of substantial facts underlying those assertions of need, that precious freedom to be secure from unwarranted searches and seizures is similarly implicated.
 
 
 39
 The fundamental principles surrounding the fourth amendment still serve us well. Only with the greatest caution should we whittle away basic constitutional rights, for we often come to regret the unfortunate rulings we have made in times of hysteria in the past. Compare, e.g., Korematsu v. United States, 323 U.S. 214, 217-19, 65 S.Ct. 193, 194-95, 89 L.Ed. 194 (1944) (exclusion from areas of the west coast during World War II of all persons of Japanese ancestry held constitutional on grounds of military necessity) and Hirabayashi v. United States, 320 U.S. 81, 101, 63 S.Ct. 1375, 1386, 87 L.Ed. 1774 (1943) (finding curfew regulations imposed against citizens of Japanese ancestry not unconstitutionally discriminatory), with Hohri v. United States, 782 F.2d 227, 231-39 (D.C.Cir.), cert. granted, --- U.S. ----, 107 S.Ct. 454, 93 L.Ed.2d 401 (1986) (in treating statute of limitations issues raised by money damages claims filed by Japanese-American World War II internees or their representatives, court discusses history of litigation surrounding their internment and notes that the "military necessity" grounds to which the Supreme Court deferred in Hirabayashi and Korematsu were found by a subsequent congressional commission to be without factual foundation). Neither the environment of the prison workplace nor a well-meant desire to stem the use of illicit drugs should be used to tip the balance of Fourth Amendment interests in favor of the state without factual findings on the record to prove the institution's real needs.
 
 Searches of the Person--Urinalyses
 
 40
 I join the majority in holding that urinalysis is a search under the fourth amendment. However, the majority's reliance on Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986), to hold that urinalysis is a less intrusive search than a blood test is misplaced. Although the court in Capua did observe that no intrusion into the body is required to collect a urine sample, it also stated that urine "is normally discharged and disposed of under circumstances that merit protection from arbitrary interference." 643 F.Supp. at 1513. Then, quoting from the district court's opinion in this case, the court in Capua stated that "[o]ne does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds." Id. (quoting McDonell, 612 F.Supp. at 1127). A search's intrusiveness does not hinge merely upon whether or not a person's skin is punctured or body touched in some way, but must be evaluated in terms of the individual's legitimate expectations of privacy in the context in which the search is conducted. Cf. Kirkpatrick v. City of Los Angeles, 803 F.2d 485, 489-90 (9th Cir.1986) (in concluding the strip searches of police officers for investigative purposes are governed by the reasonable suspicion standard, the Ninth Circuit found that the fact that a search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that the search may be a significant intrusion on the person searched). As the court in Capua recognized, "[a] urine test done under close surveillance of a government representative, regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience." Capua, 643 F.Supp. at 1514.
 
 
 41
 Moreover, in extending the scope of the district court's order delineating the circumstances under which the Iowa Department of Corrections may require that its employees undergo urinalysis, the majority engages in de novo fact finding contrary both to Fed. R. Civ. P. 52(a) and to the Supreme Court's guidelines for appellate review set out in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As the Supreme Court stated in Anderson, the clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson, 470 U.S. at 573, 105 S.Ct. at 1512. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574, 105 S.Ct. at 1512 (citations omitted).
 
 
 42
 The majority modifies the district court's opinion to hold that urinalyses need not be conducted on a reasonable suspicion basis but rather "may be performed uniformly or by systematic random selection of those employees who have regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons." Ante at 1308. In support of this holding, the majority states that "it is * * * logical to assume that employees who use the drugs, and who come into regular contact with the prisoners, are more likely to supply drugs to the inmates, although the trial court did not agree with this observation." Id. The majority is plainly aware that the district court's findings after reviewing all the evidence are to the contrary. The district court specifically found that conducting urinalyses with the object of "possib[ly] * * * discovering who might be using drugs and therefore [who] might be more likely than others to smuggle drugs to prisoners is far too attenuated to make seizures of body fluids constitutionally reasonable." McDonell, 612 F.Supp. at 1130. Whether identification of employees whose urine tests positively for use of controlled substances also indicates which employees are engaged in smuggling contraband into the prison is precisely the sort of choice between views of the evidence which the Court in Anderson counseled should be left in the hands of the trial court. The majority's modification of the district court's order to allow random searches of the urine of prison employees who come into contact with inmates, based not on facts in the record but on de novo findings at the appellate level, is improper and unsupportable.
 
 
 43
 The majority again engages in impermissible factfinding when it disagrees with the district court's limitation of the institution's right to conduct urinalyses on a reasonable suspicion basis to only those employees "then under the influence of alcoholic beverages or controlled substances." See McDonell, 612 F.Supp. at 1130. In place of the standard established by the district court, the majority extends the scope of permissible testing to situations where there is reasonable suspicion "that controlled substances have been used within the twenty-four hour period prior to the required test." Ante at 1309. Not only is this precisely the sort of trial court finding to which an appellate court is instructed under Anderson to give deference, but the majority states no reasons why the district court's order as originally phrased is clearly erroneous on this point. In making this modification, the majority apparently assumes that use of controlled substances within twenty-four hours before a test indicates that the individual employee's ability to perform his or her job is impaired. If so, then the district court's order as originally phrased seems to cover all security risks that might arise and needs no modification by this court.
 
 Vehicle searches
 
 44
 The majority also improperly modifies the district court's order to extend the prison officials' ability to search employee vehicles to include those vehicles parked outside the prison confines. Although no one wants prison employees to act as couriers for contraband onto prison property, the fact that these vehicle searches might be effective in identifying and halting such smuggling does not make those searches reasonable under the fourth amendment. Moreover, the record indicates that the prison administration has been less than diligent in taking adequate precautions to prevent the inflow of contraband onto prison grounds by other means. Surely it is desirable that the institution be required to take all less intrusive steps possible to secure its buildings and grounds before it may take the more intrusive action of randomly searching its employees' vehicles. Nor does Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), provide support for the majority's modification of the district court's order. Although Hudson does hold that searches of prisoner cells are an exception to the fourth amendment, see 468 U.S. at 530, 104 S.Ct. at 3202, it is crucial to remember that what is to be searched here are not prisoner cells, but employee vehicles.
 
 
 45
 I fully appreciate that the constitutional rights of inmates must be curtailed to some extent based upon perceived institutional needs to maintain discipline and security. See, e.g., Block v. Rutherford, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). It is understandable that certain restrictions must also be imposed on civilian employees working within the prison itself in order to assure the orderly conduct of the inmates. Obviously, utmost loyalty to the institution is required from the prison staff and any employee's failure to comply with necessary rules or actions which are otherwise harmful to the purpose of this institution should lead to some sort of sanction. However, the mere fact that a person works for a state prison system does not in itself justify depriving that individual of the constitutional right to be secure in the privacy of his or her person or property.
 
 
 46
 What we achieve here is simply to drive another nail into the coffin of discarded individual constitutional rights. If a prison guard is transferring weapons or drugs within the confines of the prison to prison inmates, it is difficult to believe that the well-established principles of the fourth amendment cannot achieve the necessary discipline and security interests now deemed compelling enough to justify limitation of state employees' privacy rights in the prison workplace. To urge that lessened privacy standards will prevent rule violations by prison employees is on this record only a conclusory assumption--a poor replacement for rigorous legal reasoning based on facts proved in front of a district court. The district court found, based on the record, that the need to maintain prison discipline and security justifies urinalysis only on grounds of reasonable suspicion and uniform systematic random searches only of vehicles parked within the institution's confines. Because I believe that we should defer under the clearly erroneous rule to the district court's evaluation of the record and to its findings of fact, I dissent.
 
 
 47
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEAPPENDIX E
 
 JUDGMENT AND INJUNCTION ORDER
 
 48
 It is the declaratory judgment of the court that the Department's policy, Appendix A attached hereto, violates the Fourth Amendment rights of plaintiffs and the certified class insofar as it permits searches and seizures prohibited by the following injunction.
 
 
 49
 Defendants and their officers, agents, servants and employees are hereby enjoined from conducting searches of the persons of plaintiffs and members of the certified class (employees) pursuant to the Department's policy, except as follows:
 
 
 50
 (1) Employees entering, or who have entered, a correctional institution may be searched by use of a magnetometer or similar device, by a pat-down search by a person of the same sex, and by an examination of the contents of pockets, bags, purses, packages and other containers. Such a search may be conducted without cause, but must be done uniformly or by systematic random selection, and not by discriminatory or arbitrary selection of persons to be searched.
 
 
 51
 (2) Any strip search or any other body search that is more intrusive than the type allowed by subparagraph (1) above may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee to be searched is then in possession of a weapon or drugs or other contraband. Such a search is to be made only on the express authority of the highest officer present in the institution, made by one of the same sex in a private setting, and the specific objective facts shall be disclosed to the employee before the search is conducted and shall be reduced to writing and preserved.
 
 
 52
 Defendants and their officers, agents, servants and employees are hereby further enjoined from demanding from plaintiffs and members of the certified class (employees), pursuant to the Department's policy, any urine, blood or breath specimen for chemical analysis, except that they are not enjoined from:
 
 
 53
 (1) Demanding of an employee who has entered a correctional institution a urine, blood, or breath specimen for chemical analysis on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee is then under the influence of alcoholic beverages or controlled substances. Such a demand is to be made only on the express authority of the highest officer present in the institution, and the specific objective facts shall be disclosed to the employee at the time the demand is made and shall be reduced to writing and preserved.
 
 
 54
 (2) Requiring an employee-applicant or an employee to provide blood and urine specimens as part of a pre-employment physical examination or as part of any routine periodic physical examination that may be required of employees.
 
 
 55
 (3) Requiring an employee to periodically submit a specimen of blood, urine or breath as a condition of continued employment under a disciplinary disposition if such a condition is reasonably related to the underlying basis for the disciplinary action and the duration of the condition is specified and is reasonable in length.
 
 
 56
 Defendants and their officers, agents, servants and employees are hereby further enjoined from searching privately owned motor vehicles belonging to or used by plaintiffs and members of the certified class (employees) pursuant to the Department's policy, except that motor vehicles that are parked within the institution's confines where they are accessible to inmates[7] may be searched without cause, but such searches must be done uniformly or by systematic random selection, and not by discriminatory or arbitrary selection of employees whose motor vehicles are to be searched. Searches of employees' motor vehicles within the institution's confines where they are accessible to inmates, other than uniformly or by systematic random selection, may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that there is a weapon or drugs or other contraband in the motor vehicle to be searched. Such a "reasonable suspicion" search is to be made only on the express authority of the highest officer present in the institution, and the specific objective facts shall be disclosed to the employee whose motor vehicle is searched before the search is conducted and shall be reduced to writing and preserved.[8]
 
 
 57
 It is the further judgment of the court that plaintiff McDonell shall be paid the ten days' salary that he lost in conjunction with his temporary discharge.
 
 
 58
 DATED this 9th day of July, 1985.
 
 
 59
 /s/ Harold D. Vietor
 
 
 60
 HAROLD D. VIETOR,
 
 Chief Judge
 Southern District of Iowa
 
 
 [1]
 The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa
 
 
 [2]
 The policy in effect at the time of the district court's order is attached as Appendix A. The revised policy is attached as Appendix B
 
 
 [3]
 A copy of this form is attached to this opinion as Appendix C
 
 
 [4]
 A copy of this form is attached to this opinion as Appendix D
 
 
 [5]
 The district court found that there were approximately 1750 correctional institution employees of the Department who are within the certified class
 
 
 [6]
 The district court noted that, although the Department's policy as written did not expressly mention submission of blood, urine and breath samples, there was no dispute that the policy was considered to include submission of such samples. The revised version of the Department's policy does mention urinalysis and blood tests
 
 
 [7]
 The text of the district court's order entered July 9, 1985, is included as Appendix E to this opinion
 
 
 [8]
 In describing constitutionally protected privacy interests, the Supreme Court uses the words "reasonable" and "legitimate" interchangeably. California v. Ciraolo, --- U.S. ----, ----, 106 S.Ct. 1809, 1816 n. 4, 90 L.Ed.2d 210 (1986)
 
 
 [7]
 The term "within the institution's confines where they are accessible to inmates" means within confines within which the general inmate population is kept. The term does not mean within some outer perimeter where low security risk inmates are sometimes allowed to go on work details
 
 
 [8]
 None of the injunctive relief granted herein precludes any search and seizure authorized by a judicially issued search warrant, or a search and seizure without a warrant made on the basis of "probable cause" within the meaning of the Fourth Amendment if made under one of the established exceptions to the Fourth Amendment's warrant requirement, or a search made pursuant to a valid and voluntary consent given immediately before the search is conducted