Pursuant to the memorandum opinion filed herein on this date,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment be and is entered in favor of defendants City of Wentzville, John DeWinters, Lee Barton, Chauncey Randall, Darrell Lackey, Michael Zoellner, Mark Clampitt and David Hoekel and against plaintiff Kenneth Black at plaintiff's costs. Defendants' counterclaims against plaintiff be and they are dismissed.

**Patricia Ann GLOVER, et al.,**
**Plaintiffs,**

**v.**

**EASTERN NEBRASKA COMMUNITY OFFICE OF RETARDATION, et al., Defendants.**

**No. CV. 87–0–830.**

United States District Court,
D. Nebraska.

March 29, 1988.

---

**2.** Defendants City of Wentzville, Mayor and Board of Aldermen have counterclaimed seeking declaratory judgment to enjoin plaintiff from returning to the City of Wentzville as an employee. Since offer of any employment is at defendants' own discretion, the Court dismisses this counterclaim.

Patrick Kennison, Michael G. Connery, Michael Jahnke, Omaha, Neb., for plaintiffs.

Bruce G. Mason, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

STROM, Chief Judge.

This matter is before the Court for determination after trial to the Court. Jurisdiction of this Court is pursuant to 28 U.S.C. § 1331. Pursuant to Fed.R.Civ.P. 52, the Court sets forth the following findings of fact and conclusions of law.

The controversy in this case surrounds the Chronic Infectious Disease Policy No. 8.85 (the policy) adopted by the governing board of defendant Eastern Nebraska Human Services Agency (ENHSA) which requires certain employees to submit to mandatory testing for tuberculosis (TB), hepatitis B (HBV), and human immunodeficiency virus (HIV). The policy also contains a reporting requirement for employees who know or suspect they have any of the diseases and a disclosure requirement for employees who are hospitalized or receiving treatment for any of the diseases. This Court issued a temporary restraining order on December 7, 1987, restraining all testing for HIV and the reporting and disclosure requirements for all of the specified diseases. A revised policy was adopted on January 20, 1988, and it is the subject of this action.[1]

The plaintiffs in this class action suit consist of Patricia Ann Glover, Michael R. Macrander, Susan I. Davidson, Mary St. George, Rebecca A. Demuth, Timothy Siko-ra, Daphne Holmes, Shawne A. Kinsman, and Daniel B. Champ, on behalf of themselves and all other persons similarly situated. This action proceeds as a class action [2] with these named plaintiffs as proper class representatives, and the class is defined as:

All current employees of the Eastern Nebraska Community Office of Retardation (ENCOR) employed in a position or job title identified in Eastern Nebraska Human Services Agency (ENHSA), chronic infectious disease personnel policy No. 8.85 effective date January 20, 1988, which positions are identified by policy 8.85 as home teacher, residential associate, residential assistant, vocational program manager, vocational production manager, registered nurse, and licensed practical nurse, and which positions or job titles are, pursuant to policy 8.85, subject to the ENHSA chronic infectious disease "testing requirement" (Par. II of ENHSA personnel policy 8.85) for human immunodeficiency virus (HIV) and hepatitis B (HBV), the ENHSA chronic infectious disease reporting requirement (Par. III(a) of ENHSA personnel policy 8.85) for HIV and HBV and the ENHSA chronic infectious disease "disclosure requirement" (Par. III(b) of ENHSA personnel policy 8.85) for HIB and HBV.

The defendants in this action are: the Eastern Nebraska Community Office of Retardation (ENCOR); the Eastern Nebraska Human Services Agency (ENHSA); the members of the governing board of ENHSA, Michael Albert, Donald Claasen, Ronald Hineline, Ray Lind and Hilton Rogers; the Executive Director of ENHSA, Ray Christianson; and the Executive Director of ENCOR, Donald Moray.

The following facts may be accepted as established facts for the purposes of this case. The defendant ENHSA was established by Cass, Sarpy, Dodge, Washington, and Douglas Counties in Eastern Nebras-

---

1. The plaintiffs have not challenged the policy as to tuberculosis, thus that disease is not at issue here.

2. The parties stipulated in Paragraph D(16) of the pretrial order that this action should proceed as a class action as defined. The Court approved this stipulation at the pretrial conference on February 10, 1988.

ka, and created pursuant to the Nebraska Interlocal Cooperation Act, Neb.Rev.Stat. § 23–2201, et seq. The defendant ENCOR is a part of ENHSA and is organized under Neb.Rev.Stat. § 83–1,141 through 83–1,146. ENCOR is subject to all of the rules and regulations of ENHSA including the chronic infectious disease policy (Personnel Policy and Procedures Manual—Policy No. 8.85 as adopted by the ENHSA governing board effective November 18, 1987, and revised on January 20, 1988).

The ENHSA governing board was created under authority granted by the Nebraska Interlocal Cooperation Act, and is comprised of one elected county commissioner from Dodge, Washington, Douglas, Sarpy and Cass Counties which make up Region VI under Neb.Rev.Stat. § 83–1,143.06. The members of the ENHSA governing board who adopted the policy are Michael Albert, Donald Claasen, Ronald Hineline, Ray Lind and Hilton Rogers, and are all county commissioners from each of the counties which make up Region VI.

The ENHSA governing board is responsible for: (a) governing and supervising the operation of ENHSA; (b) the appointment of ENHSA's Executive Director; (c) creation and enforcement of ENHSA rules; (d) the adoption of the annual budget; (e) establishing the amount of funds to be requested of each county; and (f) the general management of ENHSA. Funds for ENHSA and ENCOR are provided for by the federal government, the counties, and the State of Nebraska.

The policy in question requires employees in certain identified positions to submit to mandatory testing for tuberculosis (TB), the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV or the AIDS virus), or be subjected to discipline for refusal to test.

The testing requirement will be applied annually if recommended by the agency's medical consultant to employees in the identified positions, and ENHSA reserves the right under the policy to require employees testing positive for TB, HBV or HIV to be tested more frequently than annually.

The policy also requires employees in the identified positions who know or suspect that they have a chronic infectious disease, as identified in the policy, to inform the ENCOR employee relations officer immediately. Failure to inform will result in disciplinary action which may include termination. [The reporting requirement, Policy, Par. III(a).]

The policy requires employees in the identified positions hospitalized or receiving treatment for a chronic infectious disease, as identified in the policy, to submit the medical records relating to treatment for the disease to the ENCOR employee relations officer, if requested. [The disclosure requirement, Policy, Par. III(b)]. Curtis Starks, the affirmative action director and employee relations officer at ENHSA, will have responsibility for notifying ENCOR employees in the identified positions of positive test results.

The Eastern Nebraska Community Office of Retardation (ENCOR), a sub agency of the Eastern Nebraska Human Services Agency (ENHSA) is a community based program which provides residential, vocational and other specialized services for the mentally retarded. ENCOR serves approximately six hundred clients who are mentally retarded, ranging from the mild to the profound level of retardation. ENCOR's client based foundation respects the individual rights of its clients, and the agency works diligently to insure that these rights are upheld on behalf of these clients. ENCOR's philosophy recognizes the dignity of risk, thus permitting its clients to live life with all its inherent risks, as they live in a community setting.

In this regard, ENCOR staff members receive training in numerous areas. For example, the staff members are taught behavior management skills and passive defense skills to enable them to deal with violent and/or aggressive clients in a nonabusive manner. Violent and aggressive behavior by the clients does exist at ENCOR. The evidence in this case shows numerous incidents involving biting, scratching,

throwing of objects, hitting, violent outbursts, and pinching by the clients.

The testimony in this case establishes that the ENCOR staff is extremely capable of handling these behaviors through the various techniques they have learned at ENCOR. The passive defense techniques and behavior management training assist the staff in spotting potentially violent behavior and other behavior problems and protecting themselves from harm. The evidence demonstrates that the ENCOR staff is capable, caring and dedicated. The testimony of Frank Menolascino, M.D., is that the ENCOR staff is good to superior and that "precious few" of ENCOR's clients are found to be unmanageable, approximately three to five over a twenty-year year period. In addition, John McGee, Ph.D., stated that one of the "blessings" of ENCOR is its staff and that ENCOR is one of the top three programs in the country.

Extensive medical testimony was presented in this case concerning the human immunodeficiency virus or acquired immune deficiency syndrome (AIDS), hepatitis B, and other related matters. The human immunodeficiency virus is a retrovirus that attacks white blood cells (T-lymphocytes) in the human blood. This virus attacks the immune system and damages the ability of the infected person to fight off other diseases and the person then becomes susceptible to opportunistic infections.

Once infected with the virus, a person may show no signs of illness. Such a person does not have AIDS but is a carrier of the virus. Some of these infected persons go on to develop AIDS–related complex (ARC), a condition caused by the AIDS virus. Symptoms of ARC include weight loss, diarrhea, enlarged lymph nodes, and night sweats. As a result of the progression of the infection, "frank" or "full blown" AIDS can develop.[3] At this stage in the disease, the body's immune system is destructing and other diseases invade the body. These opportunistic infections, so called because they use the opportunity of the person's lowered resistance to invade the body, can and often do result in death.[4]

There is no known cure for AIDS, nor is there yet a vaccine to prevent it. Extensive research has been, and continues to be, conducted on the epidemiology of this disease to determine how it acts and is transmitted.

The medical evidence shows that the AIDS virus is present in semen, vaginal and cervical secretions, blood, breast milk and, in rare instances, tears and saliva. The primary routes of transmissions are via sexual contact with an infected person and by intravenous drug use, that is, by the sharing of hypodermic needles. The virus may also be transmitted by blood transfusions, across the placenta from mother to fetus, through mother's milk, and by prolonged exposure of broken skin to massive amounts of infected blood. Although the virus may be found in tears or saliva, no reported transmissions via these fluids have been reported.

In very rare instances, the virus has also been transmitted to health care workers through needle stick accidents and, even more rarely, through contact with massive quantities of infected materials. The medical evidence establishes that the AIDS virus is not transmitted by casual contact.[5]

Hepatitis B (HBV) is an infectious virus which is transmitted primarily by blood and sexual routes, not by casual contact. This virus is a much hardier than HIV, and there is a higher probability of infection from HBV than from HIV.

3. Medical science has not yet determined the time period of the progression of this disease from infection to full-blown AIDS. There are instances of HIV exposures which have not developed into AIDS. Medical science does not yet know if this is the result of a long incubation period or if these people will never get AIDS.

4. Current statistics show that approximately 52,-000 cases of "full blown" AIDS have been reported and 28,000 of these people have died from the disease.

5. Casual contact includes, but is not limited to, touching, sneezing, coughing, breathing, handshakes, sharing of food or eating utensils, use of public toilets, sharing of drinking glasses, and the sharing of towels.

Unlike HIV, HBV is not a fatal disease, although there is mortality associated with the virus. Ninety-five per cent (95%) of those infected with HBV will fully recover. Of the remaining five per cent (5%), the disease will be fatal to ten to twenty per cent of these individuals, while the others will develop chronic hepatitis involving slow, gradual liver damage and will die some five to twenty-five years later from cirrhosis.

Also, unlike HIV, a highly effective immunization is available to control the spread of HBV. This immunization is recommended for health care workers by the Centers for Disease Control (CDC). Protection of unimmunized individuals who are exposed to HBV is available in the form of hepatitis B immune globulin. These two measures are available to ENCOR and are effective to prevent the spread of HBV.

ENCOR began its concern with the AIDS virus as a result of general publicity about the AIDS problem. Curtis Starks, the affirmative action director for ENHSA, began to collect information on the disease. The majority of the information collected came from the Omaha World Herald and the U.S.A. Today newspapers.

In July of 1987, ENCOR's concern with AIDS became more acute when it learned that two clients from the Omaha Manor facility, a private facility that had recently closed, who were transferred to the Beatrice State Development Center, tested positive for the AIDS virus. Even though these clients were eventually found to not have the virus, the intense concern had taken root at ENCOR.

In September of 1987, an ENCOR employee, unrelated to the Omaha Manor incident, died from AIDS. At this point, the ENHSA governing board instructed Executive Director Donald Moray to develop a policy for mandatory AIDS testing of employees. The original policy was announced and challenged by the ENCOR employees. After this Court restrained the policy, and pending the trial on the merits, the policy was reviewed and some aspects were changed. The new policy, effective January 20, 1988, states that the persons holding or applying for the following titles must undergo testing: home teacher,[6] residential associate,[7] residential assistant,[8] vocational program manager,[9] vocational production manager,[10] registered nurse,[11] and licensed practical nurse.[12] The policy also states that new positions may be added to the list. The rationale behind testing staff members in the identified positions is that these positions involve extensive contact with clients. The evidence in this case, however, shows that staff members who hold non-test positions have also been the recipients of bites and scratches from ENCOR clients.

The evidence shows that the ENCOR staff member who died from AIDS was

6. A home teacher provides a home environment to mentally retarded children or adults and is responsible for providing care and instruction to the client living in their home.

7. A residential associate is responsible for the direct care and instruction of individuals receiving residential services and the monitoring and assisting in the care and upkeep of the residential facility.

8. A residential assistant is responsible for the direct care and instruction of individuals receiving residential services. This job includes providing services to clients and giving them the instruction necessary to be as independent as possible for activities which occur in their own lives.

9. A vocational program manager is responsible for preparing mentally retarded citizens for competitive employment and instructs clients in socialization, academics, communication skills, community access, self-management and work skills acquisition development.

10. A vocational production manager is responsible for production duties to insure realization of contract deadlines, quality control, efficient work flow, proper utilization of clients, training clients in work skills and shop maintenance and safety.

11. A registered nurse is responsible for coordination, consultation, training and monitoring of health related services to clients.

12. A licensed practical nurse is responsible for providing direct care to medically involved individuals receiving home based services. The licensed practical nurse attends to the health care needs of the clients and trains parents to meet these needs in the client's home.

involved in numerous incidents where he was bitten, scratched, pinched, kicked and hit by clients. When this staff member died from AIDS, however, ENCOR did not follow up on the clients involved in any of these incidents, nor did they notify these clients or their guardians that ENCOR believed they were potentially at risk of contracting the AIDS virus because of the contact with this staff member.

There is some evidence of sexual abuse of clients at ENCOR. These incidents, however, are not limited to staff/client contacts, of which there are few reported incidents. The testimony of the ENCOR staff members, Executive Director Moray, and Deputy Director Brinker are all in agreement and establish that there is not a sexual abuse problem at ENCOR.

The AIDS virus may be detected by two medical tests, the enzyme-linked immunoassay test (ELISA) or the confirmatory test, the Western blot. Both of these tests are blood tests which determine the presence of antibodies to the AIDS virus.

The ELISA test is a simple blood test which can detect the presence of antibodies to HIV. A positive ELISA test, however, does not mean that a person has AIDS; it merely signifies that, if the tests results are accurate, the person has been exposed to the virus. A positive result on an ELISA test is not a finding that is reportable to the CDC for this positive finding is "not evidence of AIDS, but evidence of the agent of AIDS." (Testimony of Dr. Cox).

If the ELISA test is repeatedly reactive, the employee will be given the confirmatory Western blot examination. The confirmatory Western blot test is a more specific test which identifies antibodies to HIV antigens. The test, if positive for HIV, will show a pattern of distinctive bands appearing at certain points on a paper strip which correspond to those bands on a strip associated with HIV. There is a lack of consensus among laboratories, however, as to the points on the bands that indicate the presence of HIV.

The ELISA test has a significant number of false positives. The Western blot is a more reliable test, with far fewer false positive results, yet they do occur. False positives occur as a result of laboratory error, either labeling errors or technical errors, previous illness, pregnancy, and because other retroviruses have the same molecular weight as the AIDS virus and can mimic a positive finding.

The State of Nebraska is a low prevalence area for the AIDS virus, that is, the amount of the disease in the State is low. As such, the predictive value of a positive result in any individual test is low, because the few positive test results that occur will contain some false positives. Thus, the percentage of false positives in a low prevalence community will be much higher than in a high prevalence community.

The medically indicated reasons for HIV testing are: (a) as an adjunct to the medical workup of a patient who may be infected, (b) for epidemiological purposes to establish the level of infection in a community, and (c) as a device used in conjunction with counseling those in high risk groups to stimulate them to change their high-risk behaviors. Testing in isolation as provided in ENCOR's policy does not serve these purposes.

The ELISA and Western blot tests are innocuous in themselves; however, the ramification of these tests gives rise to serious problems. A positive report of an HIV test is a "very foreboding kind of message." (Testimony of Dr. Goldsmith). The reaction of patients to this news is devastation. If not handled properly, it can lead to disastrous results, including suicide. Because of the foreboding message that accompanies a positive HIV test result, some people simply do not want to know if they are infected.

In this case, the ENCOR employees who test positive would receive this devastating message from Curtis Starks, the affirmative action and employee relations officer at ENHSA. If Mr. Starks is unavailable, the personnel director will deliver the test results to employees. In addition, tested employees will not have the option of not being told of their test results.

There is no known cure for AIDS. Experimental studies are now under way searching for a cure for this disease. There has been some limited success with the drug AZT in treating the disease, but at this point, the disease is fatal. As such, major attention has been focused on controlling the spread of the disease. Until a cure is found, education about the prevention of the disease is the best available route to deal with AIDS.

Prevention of AIDS and controlling its spread is being effectuated, for example, by education regarding drug abuse and safe sexual practices, and by testing the blood supply at blood banks. In the health care environment, where certain workers are in contact with contaminated materials, policies have been adopted which limit the kinds of contact that are dangerous. Hospital workers take "universal precautions" on the job, for example, the wearing of gloves when drawing blood and the wearing of gowns or other lab coverings when the clothing may be soiled by blood or other body fluids. Health care workers are also instructed as to the handling and disposal of needles to prevent accidental injury. It is procedures of this kind that are recommended by the CDC which has published recommendations and guidelines to help battle the spread of this disease. These recommendations and guidelines do not include, nor is there any evidence that health care workers, either generally or in select groups, are routinely screened for the presence of HIV. That these recommendations and guidelines are apparently effective is evidenced by the fact that health care workers, although theoretically at a higher risk than the general public, have few reported incidents of HIV transmission as a result of their jobs.

According to the Morbidity and Mortality Weekly Report (MMWR) of May 22, 1987, there have been five reports of HIV infection by non-needle stick exposure of health care workers who denied other risk factors. Two of these cases resulted from providing nursing care to HIV infected persons. These cases involved people who had daily, repeated contact with blood or body fluids of an infected patient over an extended period of time and who did not follow any routinely recommended barrier precautions.

Three additional health care workers have become infected with HIV following non-needle stick exposures to blood from infected patients. Two of these exposures involved prolonged contact with infected blood and with neither of the workers wearing gloves. The other exposure was the result of a blood splatter, with blood splashing into the mouth of the health care worker. Considering the number of people who are infected with the AIDS virus and the numerous health care workers who are involved in their care, the fact that only five non-needle stick exposures to this disease exist, the Court believes, is remarkable in itself.

The evidence establishes that the risk of transmission of the AIDS virus from staff to client, assuming a staff member is infected with HIV, in the ENCOR environment is extremely low, approaching zero. The medical evidence is undisputed that the disease is not contracted by casual contact. The risk of transmission of the disease to clients as a result of a client biting or scratching a staff member, and potentially drawing blood, is extraordinarily low, also approaching zero. The risk of transmission of the virus from staff to client due to the staff member attending to a client's personal hygiene needs is zero. Further, there is absolutely no evidence of drug use or needle sharing at ENCOR, nor is there a problem of sexual abuse of clients by staff.

In short, the evidence in this case establishes that the risk of transmission of the HIV virus at ENCOR is minuscule at best and will have little, if any, effect in preventing the spread of HIV or in protecting the clients. Further, from a medical viewpoint, this policy is not necessary to protect clients from any medical risks.

This case raises issues involving the Fourth Amendment rights of public employees. The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures ...," rights which are implicated only if the conduct at issue infringes "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (*quoting United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). The Fourth Amendment is enforceable against the states through the Fourteenth amendment and seeks to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *McDonell v. Hunter,* 809 F.2d 1302, 1305 (8th Cir.1987) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)).

■ Individuals have a reasonable expectation of privacy in the personal information their body fluids contain. Compulsory administration of a blood test "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). The mandatory testing required by the policy involves an involuntary intrusion into the body by the State for the purposes of withdrawing blood and constitutes a search and seizure for purposes of the Fourth Amendment. *Id.*[13] Having determined that the mandatory blood tests required by the policy constitutes a search and seizure, this Court must then determine whether the search meets the Fourth Amendment test of reasonableness.

■ To determine the appropriate standard of reasonableness in this matter, this Court must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *O'Connor,* 107 S.Ct. at 1499, citing *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967). In this matter, the Court must balance the ENCOR employees' reasonable expectations of privacy with ENCOR's interest in a safe training and living environment for all developmentally disabled persons receiving services from the agency.

That the AIDS "epidemic" is a matter of great concern to the public and to the government is a matter of common knowledge. The presently devastating character of this disease is frightening to everyone. It is in such circumstances that governmental units, the public, and most importantly, the courts, do not over-react and permit unreasonable invasions into a carefully formulated and preserved constitutional right as a response to this concern. Thus the Court is guided by the standard which requires that "both the inception and the scope of the intrusion must be reasonable." *O'Connor v. Ortega,* 107 S.Ct. at 1503. After careful consideration, the Court finds that the mandatory blood testing policy is not justified at its inception and constitutes an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution.

ENHSA's justification for the testing is the pursuit of a safe work environment for all employees and a safe training and living environment for its clients. The medical evidence, however, demonstrates that even if staff members were infected with a chronic infectious disease, the risk to ENHSA's clients is extremely low and approaches zero. The medical evidence is overwhelming that the risk of transmission of the AIDS virus in the ENCOR work place is trivial to the point of non-existence. Such a theoretical risk does not justify a policy which interferes with the constitutional rights of the staff members.

13. There is no dispute and the Court finds that the defendants are state actors as both ENHSA and ENCOR were created pursuant to the Nebraska Interlocal Cooperation Act, Neb.Rev.Stat. § 23–2201, et seq., and the governing board is comprised of one elected county commissioner from Dodge, Washington, Douglas, Sarpy, and Cass Counties who govern and supervise the operation of ENHSA. *McVarish v. Mid-Nebraska Comm. Mental Health Center,* 696 F.2d 69, 71 (8th Cir.1982).

Although the pursuit of a safe work environment for employees and a safe training and living environment for all clients is a worthy one, the policy does not reasonably serve that purpose. There is simply no real basis to be concerned that clients are at risk of contracting the AIDS virus at the work place. These clients are not in danger of contracting the AIDS virus from staff members and such an unreasonable fear cannot justify a policy which intrudes on staff members' constitutionally protected rights.

There was testimony in this case that there can be no guarantee that the ENCOR clients could not possibly contract the AIDS virus, and thus the policy is necessary because of the devastating consequences of the disease. This overly cautious, "better to be safe than sorry" approach, however, is impermissible as it infringes on the constitutional rights of the staff members to be free from unreasonable searches and seizures.

In addition, the mandatory testing of staff members is not an effective way to prevent the spread of the disease. This policy simply ignores the current state of medical knowledge which establishes that the AIDS virus is not contracted by casual contact. The defendants are simply asking that this Court approve their policy because it is better to be safe than sorry. Donald Moray, the Executive Director of ENCOR, stated that his paramount concern was to "protect clients at all cost." This approach is impermissible for "at all cost" in this case includes the violation of the plaintiffs' constitutional rights.

The Court is convinced that the evidence, considered in its entirety, leads to the conclusion that the policy was prompted by concerns about the AIDS virus, formulated with little or erroneous medical knowledge, and is a constitutionally impermissible reaction to a devastating disease with no known cure. The risk of transmission of the disease from the staff to the clients at ENCOR is minuscule, trivial, extremely low, extraordinarily low, theoretical, and approaches zero. Such a risk does not justify the implementation of such a sweeping policy which ignores and violates the staff members' constitutional rights.

Likewise, the mandatory testing of staff members for HBV is not justified at its inception. There is no evidence in this case that the clients are at risk of contracting HBV from staff members. Even if there were evidence of such a risk, the policy would not be justified as other measures exist to promote ENCOR's interests in protecting its clients. Specifically, ENCOR could administer the HBV immunization to its clients, and be prepared to administer the hepatitis B immune globulin to an unimmunized client who was exposed to the disease. In addition, unlike testing, these measures are effective in preventing the spread of HBV and protecting the health of ENCOR's clients.

Accordingly, a separate order will be issued this date in conformity with this opinion enjoining the defendant from implementing ENHSA policy 8.85, the chronic infectious disease policy, in regard to hepatitis B and human immunodeficiency virus.