941 F.2d 780
 58 Fair Empl.Prac.Cas. (BNA) 627, 60 USLW 2118,
7 IER Cases 1451, 1 A.D. Cases 1831
 John DOE, Plaintiff-Appellant,
v.
ATTORNEY GENERAL OF the UNITED STATES; the Director of the
Federal Bureau of Investigation; Richard Held, Special
Agent in Charge of the San Francisco Office, Federal Bureau
of Investigation, Defendants-Appellees.
 Nos. 89-15933, 89-16134.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 17, 1990.
Decided Aug. 1, 1991.
 
 Matthew A. Coles, American Civil Liberties Union of Northern Cal., Jo Anne Frankfurt, Employment Law Center, Christopher Byers, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff-appellant.
 Deborah Ruth Kant, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Catherine I. Hanson and Alice P. Mead, for amicus curiae of the California Medical Ass'n.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY and FLETCHER, Circuit Judges, and FITZGERALD, District Judge.*
 FLETCHER, Circuit Judge:
 
 
 1
 John Doe appeals district court judgments (1) holding that there is no private cause of action against the United States under section 504 of the Rehabilitation Act, (2) holding that the defendants did not violate Doe's right to privacy, and, (3) granting an individual defendant qualified immunity. On appeal, the case presents issues of mootness, jurisdiction, sovereign immunity, and qualified immunity.
 
 FACTS
 
 2
 John Doe was a physician and director of a clinic owned and operated by a hospital.[1] Between December 1984 and August 1988, the San Francisco office of the Federal Bureau of Investigation (FBI), under an annually renewed procurement contract, sent all of its agents to the clinic for annual physical examinations and all of its potential agents there for pre-hiring examinations. Doe performed virtually all of the physical examinations, and his salary was based in part on the number of the examinations that he did.
 
 
 3
 Doe has AIDS.[2] On about August 15, 1988, an unidentified third party told the FBI that Doe had Kaposi's sarcoma, a cancerous skin disease often contracted by persons with AIDS. The FBI asked Doe if he had AIDS. He would not confirm that he did but assured the FBI that his routine exams posed no risk to the patients. The FBI, evidently not satisfied, stopped sending agents and applicants to Doe on August 23 because of concern about his illness. Richard Held, Special Agent in Charge of the San Francisco Office of the FBI, reached this decision because Doe would not refute the allegation that he had AIDS, provide a different doctor to do the exams, or agree to tell the agents that he had AIDS and let them decide whether to permit his examination.
 
 
 4
 Amidst ongoing discussions among the FBI, Doe, and the hospital, the FBI asked hospital representatives and the FBI's Assistant Director of Administrative Services about risk. The hospital representatives said there was none; the Assistant Director did not answer the question. The FBI also consulted its lawyers. It did not consult with any independent medical authority about the potential risk. Doe, hospital and clinic officials, and FBI personnel met on September 7; the FBI still wanted to know if Doe had AIDS. Doe and the hospital still would not confirm or refute the allegation but told the FBI that Doe's examinations posed no risk to FBI agents and applicants. They told the FBI specifically that Doe adhered to the Centers for Disease Control (CDC) and American Medical Association guidelines for infection control.
 
 
 5
 On September 30, Doe sued the Attorney General of the United States, the Director of the FBI, and Agent Held. He sought temporary relief and a permanent injunction restraining the FBI from (1) entering into an agreement with anyone but Doe's hospital to perform the physicals, (2) sending the agents or applicants to anyone but the hospital because of Doe's handicap, (3) revealing to anyone that Doe was handicapped or that the handicap was AIDS, and (4) discouraging other federal agencies from using Doe's or the hospital's services. Doe also sought money damages and attorneys' fees.
 
 
 6
 The district court granted a preliminary injunction preventing the FBI from disclosing Doe's condition and from refusing to send agents and applicants to the clinic. The FBI responded by arranging with three different health care organizations, including Doe's, to provide physical examinations. Before the FBI stopped sending people to the clinic, Doe had done 30-40 physicals per month. After the preliminary injunction, he saw about five FBI patients per month.
 
 
 7
 On April 5, 1989, the district court granted summary judgment in favor of Agent Held on the ground of qualified immunity. The district court held a trial between May 9 and May 17. On August 25, 1989, the district court issued its published opinion on the remainder of the case. Doe v. Attorney General, 723 F.Supp. 452 (N.D.Cal.1989).
 
 JURISDICTION
 
 8
 The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction of the appeal under 28 U.S.C. § 1291.
 
 STANDARD OF REVIEW
 
 9
 The decision that there is no cause of action against the government under section 504 of the Rehabilitation Act is a legal question reviewed de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc). The district court's findings of fact can be reversed only if clearly erroneous. Id. Review of the district court's decision that Held is entitled to qualified immunity is de novo. Wood v. Ostrander, 879 F.2d 583, 591 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990)
 
 DISCUSSION
 I. MOOTNESS
 
 10
 The government contends that Doe's injunctive claims are moot. A few days after the district court decision, Doe was stricken with CMV retinitis, which seriously impaired his vision. He resigned from the hospital staff for reasons of disability. By the time of oral argument before our court on May 17, 1990, his vision had improved so that he could have resumed full-time work but for recurrent bouts of extreme fatigue. Doe's physician informed his lawyers that it was "extremely unlikely that he would be able to resume work full time." Appellant's Opening Brief at 5 n. 3.
 
 
 11
 Doe claims that one of the injuries he alleged at trial, distress that his coworkers' jobs are in jeopardy because of the discrimination against him, could be remedied by an injunction requiring the FBI to continue sending agents to the clinic for physicals. The hospital is not a party to the suit, however, and Doe has no standing to seek an injunction requiring the FBI to send agents to the clinic when Doe has resigned his position there.
 
 
 12
 Doe claims that even if his injunctive claims are moot, he is entitled to declaratory relief, citing Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F.2d 1103, 1113 (9th Cir.1987). The plaintiff in Zolin, however, sought declaratory relief in the complaint. When the court ruled the injunctive claim moot, it remanded for a ruling on the claim for declaratory relief. Doe did not seek declaratory relief in his complaint, and he cannot, in effect, amend it now.
 
 
 13
 The capable-of-repetition-yet-evading-review exception in mootness doctrine also does not save Doe's injunctive claims. This exception provides only minimal protection to individual plaintiffs. Under Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348-49, 46 L.Ed.2d 350 (1975) (per curiam), the challenged action must be too short in duration "to be fully litigated prior to its cessation or expiration," and there must be "a reasonable expectation that the same complaining party would be subject to the same action again." Persons with AIDS complaining about discrimination against them because of their disease fit the evading-review requirement. They will usually become disabled or even die before a civil action can traverse the entire judicial field. Doe cannot show, however, that we can reasonably expect him to be subject to the same FBI action in the future. By his own admission, he will not return to work. His injunctive claims are therefore moot.
 
 II. JURISDICTION
 
 14
 Although the injunctive claims are moot, we remain confronted with Doe's damage claims. First we must consider the jurisdiction of the district court to adjudicate these claims. Under the Tucker Act, 28 U.S.C. § 1491(a), the Court of Claims has exclusive jurisdiction over all damage claims against the federal government "in cases not sounding in tort."[3] A discrimination claim under the Rehabilitation Act does sound in tort, however, not contract.
 
 
 15
 The Supreme Court's approach to statutes of limitations for the federal civil rights laws are instructive. In Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62, 107 S.Ct. 2617, 2620-22, 96 L.Ed.2d 572 (1987), the Supreme Court addressed the issue of what statute of limitations should apply to actions under 42 U.S.C. § 1981. Section 1981 prohibits discrimination in making and enforcing contracts and other activities. Like 42 U.S.C. §§ 1982 and 1983, which prohibit discrimination in property rights matters and under color of state law, respectively, section 1981 does not contain its own statute of limitations; federal courts are to apply "the most appropriate or analogous state statute of limitations." Id. at 660, 107 S.Ct. at 2620. In Wilson v. Garcia, 471 U.S. 261, 266-68, 105 S.Ct. 1938, 1941-43, 85 L.Ed.2d 254 (1985), the Supreme Court had decided that the state statute of limitations for personal injury claims is most appropriate to and must be applied in section 1983 actions. In Goodman, the appellant argued that because section 1981 dealt "primarily with economic rights, more specifically the execution and enforcement of contracts," the more appropriate statute of limitations is the one applicable to suits for interference with contractual rights.
 
 
 16
 The Court disagreed, holding that the personal injury statute must be applied also in section 1981 actions. Id. at 661, 107 S.Ct. at 2621. The Court reasoned,
 
 
 17
 Insofar as [section 1981] deals with contracts, it declares the personal right to make and enforce contracts, a right, as the section has been construed, that may not be interfered with on racial grounds. The provision asserts, in effect, that competence and capacity to contract shall not depend upon race. It is thus part of a federal law barring racial discrimination, which ... is a fundamental injury to the individual rights of a person.... That § 1981 has far-reaching economic consequences does not change [the] conclusion [that § 1981 claims should also be characterized as personal injury claims], since such impact flows from guaranteeing the personal right to engage in economically significant activity free from racially discriminatory interference.
 
 
 18
 Id. at 661-62, 107 S.Ct. at 2621.
 
 
 19
 The Seventh Circuit has also held recently that "the rights that antidiscrimination laws such as Title VII and section 1981 and their state equivalents confer on employees are not contract rights.... [They] are a species of tort right." McKnight v. General Motors Corp., 908 F.2d 104, 112 (7th Cir.1990) Doe is not an employee of the FBI; he is claiming in effect as a third-party beneficiary of the contract between the FBI and the hospital that the FBI discriminated against him in ceasing to send FBI recruits and agents to the clinic for their physicals. Under the Supreme Court's reasoning in Goodman, however, his discrimination allegation, though related to a contract, should be characterized as a personal injury claim, not a contract claim.[4] Doe's damage claims against the government therefore need not be heard in the Court of Claims; the district court had jurisdiction to decide them, and we have jurisdiction to review its decision.
 
 
 20
 III. SOVEREIGN IMMUNITY UNDER THE REHABILITATION ACT
 
 
 21
 The government asserts that the doctrine of sovereign immunity cloaks the FBI with immunity from a damages suit for violation of section 504 of the Rehabilitation Act. Before discussing whether the government has waived its sovereign immunity, we will lay the substantive groundwork by reviewing section 504's protection of the handicapped and the remedies available for its enforcement.
 
 A. Section 504
 
 22
 Section 504 of the Rehabilitation Act of 1973, as amended and codified at 29 U.S.C. p 794(a), states:
 
 
 23
 No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
 
 
 24
 (Emphasis added.) The paragraph continues to direct the heads of executive agencies to promulgate regulations, after receiving congressional approval, to carry out the Act. The emphasized clause and the direction to issue regulations are amendments passed in 1978. Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. No. 95-602, § 119, 92 Stat. 2955, 2982. The 1978 Act was a comprehensive re-evaluation of the 1973 Act whose purpose was to "extend and strengthen" the 1973 Act programs. H.R.Rep. No. 1149, 95th Cong., 2d Sess. 1, reprinted in 1978 U.S.Code Cong. & Admin.News 7312, 7312; see also H.R.Rep. No. 1188, 95th Cong., 2d Sess. 1, 1978 U.S.Code Cong. & Admin.News 7355, 7355 (purpose to "revise and extend" the 1973 Act programs); H.R.Conf.Rep. No. 1780, 95th Cong., 2d Sess. 65, 1978 U.S.Code Cong. & Admin.News 7375, 7375 (purpose to extend and establish additional programs).
 
 
 25
 Doe relies on the section 504 clause added by the amendment, which prohibits discrimination "under any program or activity conducted by any Executive agency," not on the pre-existing clause, which prohibits discrimination "under any program or activity receiving Federal financial assistance." The pre-amendment version does not protect Doe from the FBI's alleged discrimination: the arrangement between the FBI and the hospital is a procurement contract, specifically excluded from the definition of "federal financial assistance." 28 C.F.R. § 41.3(e) (1990). With the 1978 amendment, however, Congress intended to close this loophole, subjecting federal agencies to section 504's nondiscrimination requirement. See 124 Cong.Rec. 13,901 (1978) (statement of Rep. Jeffords) (eliminates federal government's exemption); id. at 38,549 (statement of Rep. Brademas) (requires federal compliance); id. at 38,551 (statement of Rep. Jeffords) (eliminates federal government's exemption); id. at 38,552 (statement of Rep. Sarasin) (extends coverage to federal government). The Justice Department has issued regulations enforcing section 504 that prohibit discrimination on the basis of handicap. 28 C.F.R. § 39.130(b) (1990). Regulation (b)(5) states specifically, "The agency, in the selection of procurement contractors, may not use criteria that subject qualified handicapped persons to discrimination on the basis of handicap."
 
 
 26
 Section 504 originally did not provide an explicit remedy for the proscribed discrimination. Prior to the 1978 amendment, however, several courts had implied a private right of action. Davis v. Southeastern Community College, 574 F.2d 1158 (4th Cir.1978), rev'd on other grounds, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); Leary v. Crapsey, 566 F.2d 863 (2d Cir.1977); United Handicapped Fed'n v. Andre, 558 F.2d 413 (8th Cir.1977); Lloyd v. Regional Transp. Auth., 548 F.2d 1277 (7th Cir.1977).[5] The congressional debate on the amendments demonstrates that Congress knew that the courts had interpreted section 504 to provide this means of enforcement. 124 Cong.Rec. 37,508 (statement of Sen. Stafford) ("[t]o date we have permitted certain private enforcement of Title V"[6]).[7]
 
 
 27
 In 1978, Congress also added section 505, a remedy provision, to the Rehabilitation Act.[8] Section 505(a)(2) grants the "remedies, procedures, and rights" available under Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d to 2000d-2, to persons "aggrieved by any act or failure to act by any recipient of Federal financial assistance or Federal provider of such assistance under [section 504]."[9] Section 2000d, Title VI's central provision, prohibits discrimination based on race "under any program or activity receiving Federal financial assistance."[10] Section 2000d-1 sets forth the administrative requirements for federal departments and agencies that manage federal financial assistance programs. Section 2000d-2 provides judicial and administrative remedies for persons challenging department or agency action taken under section 2000d-1.[11] Congress originally modeled section 504 on Title VI and on Title IX of the Education Amendments of 1972. Kling, 633 F.2d at 878 n. 3. Title IX prohibits discrimination based on sex "under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681, and was itself modeled on Title VI.[12] Cannon, 441 U.S. at 694, 99 S.Ct. at 1956. In the congressional debates on section 505, Senator Bayh asked and Senator Cranston confirmed that "section 505 merely extends to the handicapped the same remedies, procedures and rights already extended" through Titles VI and VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. 124 Cong.Rec. 30,349. Neither Title VI nor Title IX, like pre-1978 section 504, grants an express private right of action to people alleging discrimination under the Acts. They provide only for review of the administrative and regulatory actions taken by an agency in administering its funding programs.[13] Also, like section 504, however, courts implied such a right in both statutes. Cannon, 441 U.S. at 696-703, 99 S.Ct. at 1957-61 (discussing history of Title VI implied private right of action); id. at 717, 99 S.Ct. at 1968 (implying private right of action in Title IX). Congress knew that Title VI provided an implied private right of action for discrimination victims when it amended section 504 and added section 505(a)(2)'s remedy provision. See 124 Cong.Rec. 30,349 (statement of Sen. Bayh).
 
 
 28
 Title VI and thus section 505(a)(2) provide two different paths for pursuing relief, depending on the claimant's status. Recipients of federal assistance may pursue judicial or administrative relief as provided in section 2000d-2 when challenging an agency's administrative or regulatory action as a funds administrator. Discrimination victims, however, have a private right of action in the courts against the private discriminator implied from the Act's substantive antidiscrimination provisions. The question before us is which remedy Congress intended for victims of federal agency discrimination.
 
 
 29
 B. The Legal Standard for Ascertaining Whether the Government Has Waived Sovereign Immunity
 
 
 30
 "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769-70, 85 L.Ed. 1058 (1941) (citations omitted); Arnsberg v. United States, 757 F.2d 971, 977-78 (9th Cir.1985) (no right to money damages against United States without sovereign immunity waiver). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed" by Congress. United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969). Without such a waiver, the courts have no jurisdiction to entertain a suit against the United States.[14]
 
 
 31
 The key to determining whether there has been a waiver is Congress's intent as manifested in the statute's language and legislative history. See Block v. North Dakota, 461 U.S. 273, 287-88, 103 S.Ct. 1811, 1819-20, 75 L.Ed.2d 840 (1983) (finding no congressional intent in statutory language and legislative history to exempt states suing federal government from statute of limitations included as a condition of sovereign immunity waiver); King, 395 U.S. at 5, 89 S.Ct. at 1503 (no indication in Declaratory Judgment Act or in its history that Congress intended the Act to expand Court of Claims's jurisdiction); Sherwood, 312 U.S. at 590, 61 S.Ct. at 771 (finding no congressional intent in Tucker Act's language or legislative history to consent to suits in district courts in addition to Court of Claims); United States v. Washington, 872 F.2d 874, 879 (9th Cir.1989) ("in divining Congressional intent" to waive sovereign immunity, "we look first to the statutory language and then to the legislative history if the statutory language is unclear" (internal quotations omitted)); see also Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622-23, 69 L.Ed.2d 435 (1981) (key to determining whether statute provides private right of action is congressional intent, determined by looking first to the statutory language and structure, then to legislative history "and other traditional aids of statutory interpretation").
 
 
 32
 Inquiring whether Congress intended to provide a private right of action against the United States and under what conditions is distinct from the similar task of determining whether a statute provides a general private right of enforcement. Congressional intent need not be "unequivocally expressed" for private rights of action against non-government defendants. The Supreme Court approved using four factors in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975), to decide whether Congress has implied a private right of action in a statute: whether the plaintiff falls within "the class for whose especial benefit the statute was enacted"; whether Congress indicated its intent, either explicitly or implicitly, to create or deny a remedy; whether the remedy is consistent with the statute's underlying purposes; and whether the cause of action traditionally is pursued in the state, rather than federal, forum. As the Third Circuit noted in Patentas v. United States, 687 F.2d 707, 711 (3d Cir.1982), however, Cort has not changed the focus for implying private rights of action against the United States. In this more narrow inquiry, the central, dispositive consideration is Cort 's second factor as modified to be consistent with traditional sovereign immunity analysis, i.e., only explicit congressional intent in the statutory language and history will suffice.[15]
 
 
 33
 The case law illustrates this distinction between inferring private rights of action generally and inferring them against the United States. A private right of action may be implied against a non-government defendant even though the statutory language grants no such right explicitly and the legislative history is silent on Congress's intent to provide it. See Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981) (silent legislative history would not be fatal with some other indication of congressional intent); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) (intent need not be express but may "appear implicitly in the language or structure of the statute, or in the circumstances of enactment"); Cannon, 441 U.S. at 694, 99 S.Ct. at 1956 (when law grants specific rights to certain class, explicit purpose to deny remedy but not absence of explicit purpose to create one would be controlling); Osborn v. American Ass'n of Retired Persons, 660 F.2d 740, 745 (9th Cir.1981) ("congressional silence is not necessarily fatal to implication of a private right of action"). A silent statute and silent legislative history, however, cannot justify implying a private right of action against the United States because Congress must unequivocally express its intent to create such a right.
 
 
 34
 The case law demonstrates that the courts have consistently refused to imply private rights of action against the United States or to ignore a condition on a sovereign immunity waiver when the statute and legislative history either were silent or indicated congressional intent not to grant the right requested. See United States v. Mottaz, 476 U.S. 834, 844-48, 106 S.Ct. 2224, 2230-33, 90 L.Ed.2d 841 (1986) (government waived its sovereign immunity in Quiet Title Act only with respect to one class of cases because United States not mentioned as a potential party with regard to other class); Block, 461 U.S. at 287-90, 103 S.Ct. at 1819-22 (Quiet Title Act and legislative history contained no indication that Congress intended to exempt states from condition on sovereign immunity waiver, a specific statute of limitations); Lehman v. Nakshian, 453 U.S. 156, 160-70, 101 S.Ct. 2698, 2701-06, 69 L.Ed.2d 548 (1981) (Age Discrimination in Employment Act's language, structure, and legislative history indicated Congress's intent that waiver of United States' sovereign immunity from suits under the Act was conditioned on alleged discrimination victim having no right to jury trial); United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (no indication either in Classification Act or its legislative history that plaintiffs were entitled to back pay for positions to which they should have been appointed); Gaj v. United States Postal Serv., 800 F.2d 64 (3d Cir.1986) (Postal Reorganization Act is proscriptive with no focus on a benefited class, and neither statute's language or history shows congressional intent to create a private remedy); California v. Walters, 751 F.2d 977 (9th Cir.1984) (per curiam) (congressional intent to waive sovereign immunity only from suits for injunctive relief, not from criminal sanctions, in language and history of statute on hazardous waste disposal, 42 U.S.C. § 6961); Patentas, 687 F.2d at 710-13 (no explicit congressional intent in language or legislative history of Ports and Waterways Safety Act of 1972 to waive immunity from private lawsuits against Coast Guard to require it to fulfill statutory responsibilities); California v. Quechan Tribe of Indians, 595 F.2d 1153, 1155-56 (9th Cir.1979) (neither express terms nor legislative history of 18 U.S.C. § 1162, jurisdictional statute for criminal offenses in Indian territory, revealed any congressional intent to waive Tribe's sovereign immunity). Section 504, however, contrasts starkly with these cases, for Congress unequivocally expressed its intent in the statute's language and history to provide handicapped victims of government discrimination a private right of action for damages against the government discriminator.
 
 
 35
 C. Section 504's Language and Legislative History
 
 1. Statutory Language
 
 36
 a. Section 504
 
 
 37
 When Congress amended section 504 in 1978, it was aware, as we have discussed, that the courts had interpreted section 504 to provide a private right of action for discrimination victims. "The fact that a comprehensive reexamination and significant amendment" of the Rehabilitation Act left section 504 intact as it previously existed and under which the federal courts had implied a private right of action "is itself evidence that Congress affirmatively intended to preserve that remedy." Merrill Lynch, 456 U.S. at 381-82, 102 S.Ct. at 1841; see also Cannon, 441 U.S. at 698-99, 99 S.Ct. at 1958-59 (Congress's failure to negate private right of action implied in Title VI and Title IX provides "evidence that Congress at least acquiesces in, and apparently affirms," the right). Congress amended the statute to prohibit discrimination in "any program or activity conducted by any Executive agency or by the United States Postal Service." Significantly, Congress did not make the amendment a new section; it did not even use a new sentence. Congress appended the new coverage to the end of the pre-existing sentence under which the private cause of action had been implied.
 
 
 38
 That Congress intended violations of the new clause to be enforced in the same way as violations of the pre-existing clause is a more reasonable conclusion than that Congress intended enforcement to be different. We infer likewise from the case law that this method of amendment signifies Congress's intent that the two clauses be enforced in the same way. In Lehman, 453 U.S. at 162-68, 101 S.Ct. at 2702-06, the Court looked at a similar type of situation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. Section 7(c) of the Act had authorized civil actions for age discrimination against private employers and expressly provided the right to a jury trial. In 1974, Congress amended the ADEA. It first expanded the Act's reach by adding state and local governments as potential defendants to section 7(c), subjecting them to the same enforcement procedures as private employers. Congress further broadened the Act by proscribing age discrimination in federal employment but did so in an entirely new section (section 15) with a distinct statutory scheme without expressly including the right to a jury trial. This difference in treatment led to the Court's conclusion that Congress intended that enforcement against federal defendants be distinct from enforcement against private employers and state and local governments. Specifically, persons suing federal defendants would not have the right to a jury trial.
 
 
 39
 Lehman makes clear that adding an entirely new statutory section to make federal defendants liable for discrimination indicates Congress's intent to distinguish between enforcement for federal as opposed to other defendants. The converse is implicit; by simply adding federal liability to a pre-existing section 504, Congress intended that there be no distinction in its enforcement against federal defendants.
 
 
 40
 b. Section 505(b)
 
 
 41
 Doe points to section 505(b) as evidence that Congress must have intended that federal agencies be liable for damages for discriminating against the handicapped in their programs and activities. Section 505(b) states: "In any action or proceeding to enforce or charge a violation of a provision of [Title V], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Emphasis added.) This section specifically contemplates the United States as a party in Rehabilitation Act lawsuits. Doe notes that the United States cannot be a plaintiff under the Act. For the United States to be a prevailing party, it must be a defendant. Congress must have intended, therefore, that federal agencies be subject to lawsuits for their discrimination against the handicapped. Otherwise, part of the attorney's fees provision would be meaningless.
 
 
 42
 In reaching this conclusion, however, Doe fails to consider section 501, under which the federal government is liable for handicap-based discrimination as an employer. Section 505(b) would not be meaningless even if federal entities could not be defendants under section 504 because employees would be entitled to attorney's fees against the government in successful section 501 proceedings.
 
 
 43
 Although Doe's specific argument on section 505(b)'s meaning fails, section 505(b) does indicate congressional intent to treat all Rehabilitation Act Title V defendants the same except that the United States as a prevailing party is not entitled to attorney's fees. Section 501 makes the federal government liable for employment discrimination, section 504 makes agencies liable for discrimination in their activities other than employment, and section 505 makes the government liable for attorney's fees. There is no contrary indication that Congress intended to exclude the federal government from its reach. The statute's internal approach is to prohibit discrimination against the handicapped by anyone and to install a unitary enforcement mechanism.
 
 
 44
 The most reasonable interpretation from the language and structure of the statute is that Congress intended to make federal departments and agencies liable for discrimination against the handicapped in their programs and activities. Our reliance need not be solely on an interpretation of the language, however. The legislative history of the Rehabilitation Act buttresses this conclusion.
 
 2. Legislative History
 
 45
 Although the House Reports and House Conference Report on the Rehabilitation Act amendments, reprinted in 1978 U.S.Code Cong. & Admin.News 7312, do not explain the motivation to amend section 504 or add the section 505 remedy provision, several members of Congress explained the reasons in the congressional debates. Remarks in the House focused on the need to make the discrimination prohibitions applicable to federal agencies, while in the Senate, members focused on ensuring the viability of private rights of action through an attorneys' fees provision.
 
 
 46
 In the House debates before initial passage of the bill, Representative Jeffords, an author of the bill, stated that the purpose of the section 504 amendment was "simply [to] extend[ ] the coverage of section 504 to include any function or activity of any department or agency of the Federal Government." He continued,
 
 
 47
 When the original legislation was developed it was intended to apply to every phase of American life, but the Justice Department on September 23, 1977, issued an opinion at the request of HEW declaring that the Federal Government was exempt from the statute. This amendment removes that exemption and applies 504 to the Federal Government as well as State and local recipients of Federal dollars. The amendment requires each department and agency to promulgate regulations covering this new part. I think this is fair and appropriate and should go a long way toward developing a uniform and equitable national policy for eliminating discrimination.
 
 
 48
 124 Cong. Rec. 13,901. Representative Brademas explained, in debates over the bill after conference, that the bill "would require that Federal departments and agencies comply with the provisions of section 504." Id. at 38,549. Representative Jeffords reiterated,
 
 
 49
 under section 504, ... the conferees accepted a provision which I authored which I think brings fairness and equity to the entire picture in eliminating discrimination against the handicapped wherever it exists. In September 1977 the Justice Department issued an opinion at the request of the Department of Health, Education, and Welfare, declaring that the Federal Government was exempt from section 504. Somehow it did not seem right to me that the Federal Government should require States and localities to eliminate discrimination against the handicapped wherever it exists and remain exempt themselves. So I developed a provision which is in this conference report that extends coverage of section 504 to include any function or activity in every department or agency of the Federal Government.
 
 
 50
 Id. at 38,551. Finally, Representative Sarasin added,
 
 
 51
 [I]f laws are necessary and good, they should also apply to us. This legislation would extend the provisions of section 504 to each department, division, and agency of the Federal Government. No one should discriminate against an individual because he or she suffers from a handicap--not private employers, not State and local governments, and most certainly, not the Federal Government.
 
 
 52
 Id. at 38,552.
 
 
 53
 The Senate focused on the purpose of the attorneys' fees provision in section 505 in encouraging private enforcement of Title V. Section 505(b) states, "In any action or proceeding to enforce or charge a violation of a provision of [Title V], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." The Senate intended for this to parallel the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988.[16]
 
 
 54
 Senator Cranston stated, in debates over the Senate version of the bill, "Such allowance of attorneys' fees would be an important step in assisting all handicapped individuals in their struggle by permitting equal access to the courts to enforce the provisions of Title V." 124 Cong.Rec. 30,346. He continued,
 
 
 55
 [T]he rights extended to handicapped individuals under title V ...--Federal Government employment, physical accessibility in public buildings, employment under Federal contracts, and nondiscrimination under Federal grants--are and will continue to be in need of constant vigilance by handicapped individuals to assure compliance. Private enforcement of these title V rights is an important necessary aspect of assuring that these rights are vindicated and enforcement is uniform. The availability of attorneys' fees should assist substantially in this respect. As noted in the report to accompany S. 2278, the Civil Rights Attorneys' Fee Awards Act of 1976 (S.Rept. 94-1011):
 
 
 56
 (A)ll ... civil rights law depend [sic ] heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate congressional policies which these laws contain.
 
 
 57
 The balance of Senator Cranston's remarks further reinforced the need to provide fees to the handicapped to ensure private enforcement. Id.; see also id. at 30,349 (statement of Sen. Cranston).
 
 
 58
 In the debate on the conference version of the bill, Senator Stafford reiterated the need for private enforcement. Id. at 37,507. After essentially repeating what Senator Cranston had said a month earlier, he added,
 
 
 59
 To date we have permitted certain private enforcement of title V and, yet, we have not provided the means by which such private rights of action are meaningful. This provision [on attorney's fees] will go a long way toward assisting handicapped individuals in their efforts to achieve their full and equal share of the rights to which they are entitled.
 
 
 60
 Two things are starkly clear from the congressional debates. First, Congress intended to put the federal government on equal footing with everyone else in making it subject to section 504's prohibition of discrimination against the handicapped. Second, Congress intended to encourage private parties to pursue enforcement of Title V, including section 504, through private rights of action. The debates consider a purpose of both section 504 and 505(b) to be the development of uniformity under Title V's provisions, giving all handicapped persons an equal chance at justice. The goal of uniform private enforcement cannot be accomplished by giving a right only to injunctive relief under the APA, the position advanced by the Justice Department, when the culprit is a federal agency. Although the debates do not state outright that section 504 subjects federal agencies to private actions for money damages, they nevertheless unequivocally express Congress's intent to do precisely that.
 
 3. Case Law
 
 61
 a. The distinction between agency as administrator and
 
 
 62
 regulator and agency as proprietary discriminator.
 
 
 63
 Only one case has specifically addressed the issue of a private right of action against the government under section 504, though apparently not for damages. Cousins v. Secretary of United States Dep't of Transp., 880 F.2d 603 (1st Cir.1989). The Department of Transportation (DOT) had a regulation requiring a minimum level of hearing for truck drivers and would not grant waivers under this provision, although it did so for other physical qualifications. Cousins, a deaf truck driver with a state driver's license, sued DOT, claiming that the regulation and DOT's refusal to grant him a waiver violated section 504.
 
 
 64
 The First Circuit perceived the case as one involving a claim against a federal agency as regulator. The court found that section 504 "does not expressly provide a remedy for one harmed by a federal agency's regulatory action.... [T]he Act is silent about whether and how a person injured by the government as regulator is to enforce the Act against the government." Id. at 605 (emphasis added). The court held that Cousins had a right to relief under the Administrative Procedures Act. Id. at 607. The court stated, "Congress has not said or suggested, anywhere in the Rehabilitation Act or its legislative history, that the Act was meant to give rise to a right of action against the government as regulator, distinct from the general, background right to challenge regulatory action under the APA." Id.
 
 
 65
 Although the court did not appear to consider that a claim might derive from dealings with a federal agency acting in a capacity other than regulator, it nevertheless confined its holding to regulatory action.[17] The court considered the effects of its decision to be jurisdictional only; under the APA, Cousins's appeal from DOT's ruling would be to the circuit court. Although the court did not mention the specific relief sought by Cousins, he apparently sued only for injunctive relief. The APA provides injunctive relief, not damages. The court did not mention that its holding would eliminate a damages claim.[18]
 
 
 66
 Doe's case is distinct from Cousins. The FBI acted in its proprietary capacity, not its administrative or regulatory capacities, when it demanded that Doe either deny that he had AIDS or that the hospital find someone else to do the FBI agents' physical examinations.[19] The Justice Department claims that Doe not only should be limited to injunctive relief, but that the relief should be available only under the Administrative Procedure Act. The FBI's action, however, is clearly not the kind of agency action that Congress designed the APA to address. The APA's purpose is to provide an administrative forum for those challenging administrative and regulatory agency action, not to provide a forum for adjudicating government tort liability. The Rehabilitation Act's legislative history, in any case, demonstrates Congress's intent not to limit victims of government discrimination to enforcement through injunctive relief under the APA but to permit enforcement through the same means available against private parties: enforcement in the courts with damages and equitable remedies.
 
 
 67
 b. Title VI and Title IX parallel.
 
 
 68
 As we have noted, Congress originally patterned section 504 after Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972[20] and assumed enforcement for each would be the same. See Cannon, 441 U.S. at 696, 99 S.Ct. at 1957 (Congress assumed Title IX would be interpreted and applied as Title VI had been); 124 Cong.Rec. 30,349 (statement of Sen. Bayh) (section 505 extends Title IX "remedies, procedures and rights" to section 504). No cases, however, have addressed whether a private right of action against the federal government exists for money damages under Title VI or Title IX. This is understandable since those statutes, like pre-1978 section 504, focus on discrimination by federal financial assistance recipients, i.e., by private entities. Claims against the government for directly discriminating against program participants would be unlikely since the government neither runs nor controls such programs.
 
 
 69
 Gautreaux v. Romney, 448 F.2d 731 (7th Cir.1971), is an exception. Black tenants and applicants for public housing in Chicago did sue the Secretary of Housing and Urban Development for declaratory and injunctive relief. The Department of Housing and Urban Development provided financial assistance for public housing in Chicago. The plaintiffs asserted, and the court agreed, that the Department had violated Title VI by knowingly acquiescing in the Chicago Housing Authority's discriminatory housing program.[21]
 
 
 70
 Fortunately, cases rarely appear in which the government is accused of such discriminatory behavior. Gautreaux reinforces our conclusion, however, that persons challenging the federal government's own discriminatory activity in violations of the Title VI, Title IX, and section 504 antidiscrimination provisions should be able to present their claims in the courts of general jurisdiction.[22]
 
 D. Conclusion
 
 71
 In amending section 504, Congress made certain that federal agencies would be liable for violations of the statute. Congress's insertion of federal agencies in the pre-existing clause subjecting others to liability and its broad-brush remedy provision indicate that Congress intended that there be no distinction among section 504 defendants. The congressional debates strongly reinforce this conclusion by stressing again and again that Congress's purpose in the section 504 amendment was to put the federal government on an equal footing with everyone else so that enforcement of the section would have no gaps. Congress stressed that this footing included a private right of action for damages. We conclude, therefore, that Doe does have a private right of action against the Justice Department and the FBI and remand to the district court for findings on the merits.
 
 IV. QUALIFIED IMMUNITY
 
 72
 The district court granted Agent Held's motion for summary judgment, finding him to be entitled to qualified immunity on both the Fifth Amendment privacy and the section 504 discrimination claims, because he "did all that was reasonable under the circumstances." The district court order stated,
 
 
 73
 Evaluating the[ ] undisputed facts, the Court finds that everything Held did was reasonable. He had some duty to respond to the information that was presented to him and simply could not ignore it. He requested further investigation and imposed a requirement of confidentiality. He was confronted with a situation where the contract with the hospital was about to expire. In addition, he sought legal advice. He also sought advice from the plaintiff and the hospital, but got little cooperation. There is no genuine issue of material fact that Held did all that was reasonable under the circumstances and that he is entitled to qualified immunity.
 
 
 74
 Order re Motion by Defendant Held for Dismissal and, in the Alternative, for Summary Judgment at 3 (May 17, 1990). The relevant question for qualified immunity purposes, however, is not whether Agent Held's actions were "reasonable" in some practical sense, as the district court order suggests, but whether a reasonable official in Agent Held's position could have believed his actions were lawful in light of clearly established law.
 
 
 75
 Qualified immunity generally shields government officials performing discretionary functions "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 639, 107 S.Ct. at 3038 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. The unlawfulness of the official action in question "must be apparent," id.; where there is a "legitimate question" as to the state of the law, it cannot be said that the official's action violates clearly established law. Mitchell v. Forsyth, 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985).
 
 A. Fifth Amendment Privacy Claim
 
 76
 Doe claims that the FBI and Agent Held violated his right to privacy by requesting that he reveal to them whether he had AIDS, and by discontinuing sending agents to him for physical examinations when he refused to disclose that information. The district court assumed for purposes of Held's motion for summary judgment that Doe had identified a constitutionally protected privacy interest. It nevertheless found that Held's actions were reasonable and thus protected by qualified immunity.
 
 
 77
 The constitution protects two kinds of privacy interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). At the time of the challenged actions, it was clear that medical information was encompassed within the first privacy interest related to disclosure of personal matters. United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3rd Cir.1980) ("There can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection."); Caesar v. Mountanos, 542 F.2d 1064, 1067 n. 9 (9th Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977) (right to privacy encompasses doctor-patient relationship).
 
 
 78
 While the Ninth Circuit had not ruled on the issue, it likewise should have been plain to a reasonable government official that information regarding an individual's HIV-status or AIDS diagnosis would fall within the ambit of the privacy protection afforded medical information. See Woods v. White, 689 F.Supp. 874, 875 (W.D.Wis.1988), aff'd 899 F.2d 17 (7th Cir.1990) ("it would have been clear to a competent public official in 1986 that individuals had a constitutional right to privacy in information relating to AIDS"); Glover v. Eastern Neb. Com. Office of Retardation, 686 F.Supp. 243, 250 (D.Neb.1988), aff'd 867 F.2d 461 (8th Cir.1989) (individuals have a reasonable expectation of privacy in the personal information their body fluids contain). Certainly it was known by 1988 that an AIDS diagnosis was extremely sensitive medical information. See Chalk v. United States Dist. Court, 840 F.2d 701, 711 (9th Cir.1988); Ray v. School Dist. of DeSoto County, 666 F.Supp. 1524, 1535 (M.D.Fla.1987).
 
 
 79
 It was also clear in 1988, however, that the privacy protection afforded medical information is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest. United States v. Westinghouse, 638 F.2d at 578 (citing illustrations from Whalen v. Roe, 429 U.S. at 602 n. 29, 97 S.Ct. at 878 n. 29, of governmental intrusions held to outweigh individual privacy interests in medical information, including statutory reporting requirements relating to venereal disease, child abuse, injuries caused by deadly weapons and certification of fetal death); Caesar v. Mountanos, 542 F.2d at 1068 (doctor-patient and therapist-client privacy rights conditional rather than absolute and limited impairment may be allowed if properly justified). To decide if the government may seek or use private information, courts balance the government's interest in having or using the information against the individual's interest in denying access. United States v. Westinghouse, 638 F.2d at 577-78. The government may seek and use information covered by the right to privacy if it can show that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest. Thorne v. City of El Segundo, 726 F.2d 459, 469-71 (9th Cir.1983), cert. denied, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). The more sensitive the information, the stronger the state's interest must be. Id. at 469.
 
 
 80
 Doe concedes that the FBI has a legitimate interest in protecting the health of its agents. He argues, however, that this interest was in no way implicated because his condition presented no risk to his patients. Were we to reach the underlying question of whether Dr. Doe's privacy rights were violated, we would be required to "engage in the delicate task of weighing competing interests." United States v. Westinghouse, 638 F.2d at 578.
 
 
 81
 The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified [include] the type of [information] requested, ... the potential for harm in any subsequent nonconsensual disclosure, ... the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.
 
 
 82
 Id. The balancing task would be rendered even more difficult in this case since evaluating factors such as "the degree of need for access" would require us to consider matters on the forefront of medical technology, in an area which is in a considerable state of flux.[23]
 
 
 83
 However, we need not undertake fully the difficult balancing between Doe's right to confidentiality of his AIDS diagnosis and the FBI's interest in limited disclosure. Our inquiry in this case is limited to whether it was objectively reasonable for Agent Held to believe in 1988 that Doe's privacy interest was outweighed by the potential for danger to his agents. We note that Agent Held was aware that the physical examinations involved arguably invasive procedures (such as pelvic examinations and pap smears), that he sought only limited disclosure to the relevant FBI decisionmakers, and that he intended to take steps to safeguard the confidentiality of the information. Under those circumstances, we find that a "legitimate question" existed as to whether Held's conduct violated Doe's privacy rights. We therefore affirm the district court's holding that Agent Held was entitled to qualified immunity on Doe's privacy claim.
 
 B. Section 504 Claim
 
 84
 A person claiming discrimination under section 504 must show first that she is handicapped and second that she is "otherwise qualified" for the job.[24] See School Bd. v. Arline, 480 U.S. 273, 280-89, 107 S.Ct. 1123, 1127-32, 94 L.Ed.2d 307 (1987); 29 U.S.C. § 794(a).[25] Under Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039, Agent Held is entitled to qualified immunity only if the "contours" of Doe's rights against discrimination were not sufficiently clear in light of pre-existing law so "that a reasonable official would understand that what he is doing violates that right."
 
 
 85
 An objectively reasonable agent should have understood that Doe was handicapped. In Arline, the Supreme Court held that persons with contagious diseases may be handicapped for purposes of section 504. Id. at 280-86, 107 S.Ct. at 1127-30. Subsequent to Arline, our circuit recognized that persons with AIDS ("PWAs") have such a handicap. Chalk v. United States Dist. Court., 840 F.2d at 704-05. At the time Held ceased sending FBI recruits and agents to Doe and the clinic for physicals, the law was clear that persons with AIDS were handicapped within the meaning of the first element of section 504.
 
 
 86
 A person meets the second requirement, that she be otherwise qualified for a job, if she is able to perform "the essential functions of the job." Arline, 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17; 29 C.F.R. § 32.3; 45 C.F.R. § 84.3(k)(1). Under Arline, a person may not be otherwise qualified for a job if, in performing the job, she "expos[es] others to significant health and safety risks." 480 U.S. at 287, 107 S.Ct. at 1131. Specifically, a person who poses "a significant risk of communicating an infectious disease to others in the workplace is not otherwise qualified if reasonable accommodation will not eliminate that risk." Id. at n. 16. According to the Supreme Court, resolution of the otherwise-qualified question in most cases will require individualized inquiry and appropriate factfindings. Id. at 287, 107 S.Ct. at 1131. "Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear...." Id. The inquiry should include
 
 
 87
 [findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.
 
 
 88
 Id. at 288, 107 S.Ct. at 1131 (quoting Amicus Curiae Brief of the American Medical Association at 19).[26] "In making these findings [of fact]," the Court held, "courts should normally defer to the reasonable medical judgments of public health officials." Id.
 
 
 89
 As with the privacy claim, resolution of the ultimate question of whether Doe was "otherwise qualified" will require careful consideration of a complex issue in an area of medicine which is in considerable flux: Whether Doe, given the specific nature and manifestation of his AIDS, the type of procedures he was performing, the precautions he followed, and the facility's monitoring of those precautions, posed significant (if any) risk to patients. Once again, however, the ultimate question was not resolved by the district court, and is not before us at this juncture. We are presented only with the question of whether a reasonable official in Agent Held's position would have understood that his actions violated clearly established law.
 
 
 90
 Under Arline and Chalk, a reasonable official would have known that he could not discriminate against a PWA if the PWA were otherwise qualified to perform her job. The official would also have known that determining whether the PWA was otherwise qualified would require a reasoned medical judgment about the risk of contagion and the conditions under which contagion would occur, including the precautions under which contagion would not occur. Dr. Doe argues that Agent Held is not entitled to qualified immunity because he undertook no inquiry of a medical nature. Rather, he consulted only with nonmedical personnel--the FBI's Assistant Director of Administrative Services and the FBI's counsel. Doe and the hospital offered the only medical opinions that Held received; they asserted that Doe posed no risk to FBI patients because he conformed his conduct to the CDC Guidelines.
 
 
 91
 Agent Held asserts that his efforts to make a reasonable investigation were stymied by Doe's refusal to provide information regarding whether he had AIDS and by the need to maintain confidentiality.[27] Arguably, Agent Held should simply have assumed that Dr. Doe had AIDS and proceeded to gather information from health officials on that basis. That presupposes, however, that AIDS manifests itself in the same manner in all PWAs, and that the risk of transmission is the same in all cases and under all conditions. As a medical matter, that is not accurate; as a legal matter, reliance on such presumptions conflicts with Arline 's and Chalk 's mandate that an individualized inquiry be undertaken.[28]
 
 
 92
 It is true that Agent Held never asked Dr. Doe more specific questions about the nature of his symptoms, if any, and that Doe might have been willing to provide answers to such questions even though he refused to answer the initial inquiry regarding whether he had AIDS. Undoubtedly the better course would have been for Agent Held to have approached medical professionals to obtain information about the transmissibility of AIDS, and then to have reapproached Dr. Doe with more specific and relevant questions regarding his condition, his adherence to the CDC precautions, and any provisions by the facility for monitoring such adherence. Likewise, it would have been better for Dr. Doe, a medical professional, candidly to have provided information about his exact medical condition, his adherence to CDC guidelines, and the facility's monitoring of his compliance with those guidelines. We cannot say that at the time Agent Held took the challenged actions in 1988, he reasonably should have known that terminating the physical examinations unless Dr. Doe responded to the FBI's inquiry regarding his AIDS status was a violation of Dr. Doe's clearly established rights under section 504.[29] Accordingly, we affirm the district court's holding that Agent Held was entitled to qualified immunity on Dr. Doe's section 504 claim.
 
 CONCLUSION
 
 93
 We find the claims for injunctive relief moot and vacate the district court's opinion with respect to them. The district court and this court, rather than the Court of Claims, have jurisdiction over the damage claims. We hold that Congress waived sovereign immunity and provided a private right of action for damages for discrimination claims against the United States under section 504 of the Rehabilitation Act. We reverse the district court's contrary judgment and remand for findings on the merits. Finally, we affirm the district court's summary judgment in favor of Agent Held on the ground of qualified immunity.
 
 
 94
 VACATED in part, REVERSED in part, AFFIRMED in part, and REMANDED.
 
 
 
 *
 Hon. James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 The district court permitted the plaintiff to file a "John Doe" complaint to protect his privacy. For the same reason, the court did not use the proper names of the health care facilities within which he worked. We continue the practice of protecting his anonymity by referring to the plaintiff as John Doe and the health care facilities as the "hospital" and the "clinic."
 
 
 [2]
 Acquired Immune Deficiency Syndrome, caused by the Human Immunodeficiency Virus (HIV)
 
 
 [3]
 "The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."
 
 
 [4]
 We note that in no other case under the federal civil rights laws is the person alleging discrimination restricted from being heard in a district court (aside from fulfilling an initial requirement in some cases that administrative remedies be exhausted). We doubt that Congress intended to require discrimination victims, persons who often have limited financial resources, to file their claims against the government in a court located in Washington, D.C., rather than permitting them to file in the district court where they live
 
 
 [5]
 The Ninth Circuit agreed in Kling v. County of Los Angeles, 633 F.2d 876, 878 (9th Cir.1980), as did the Fifth Circuit in Camenisch v. University of Texas, 616 F.2d 127, 131 (5th Cir.1980)
 
 
 [6]
 Title V includes the Rehabilitation Act's nondiscrimination provisions. Section 501 prohibits discrimination in employment, including that by the federal government. Section 502 establishes a mechanism for ensuring compliance with laws dealing with architectural and transportation barriers to mainstreaming persons with handicaps. Section 503 prohibits discrimination by federal contractors. Section 504, at issue here, broadly prohibits discrimination in programs conducted by the federal government or receiving federal financial assistance
 
 
 [7]
 It is also appropriate for us to assume that Congress knew the then-existing state of the law. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 379, 102 S.Ct. 1825, 1839-40, 72 L.Ed.2d 182 (1982); Cannon v. University of Chicago, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979) ("[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law"); Citizens Comm. to Save the Land Grant Railroads v. Burlington Northern, Inc. 708 F.2d 1430, 1433 n. 3 (9th Cir.1982) (dicta)
 
 
 [8]
 Codified at 29 U.S.C. § 794a
 
 
 [9]
 Section 505(a)(1) grants the "remedies, procedures, and rights" available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, to aggrieved employees or applicants for employment under section 501 of the Rehabilitation Act
 
 
 [10]
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance
 
 
 [11]
 Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved ... may obtain judicial review of such action in accordance with [the Administrative Procedure Act, 5 U.S.C. § 702], and such action shall not be deemed committed to unreviewable agency discretion
 
 
 [12]
 Section 1681 states in full: "No person in the United States shall, on the basis of sex, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX's sections 1682 and 1683 are virtually identical to Title VI's sections 2000d-1 and 2000d-2. Section 1682 sets forth the administrative requirements for federal departments and agencies that grant financial assistance for education programs. Section 1683 provides judicial and administrative remedies in challenging department or agency action taken under section 1682
 
 
 [13]
 The section 2000d-2 and section 1683 remedies do not even apply to the central Title VI and Title IX provisions for prohibiting discrimination (sections 2000d and 1681). Section 505(a)(2) also appears incomplete, although in a different way, by providing only that victims of discrimination either by the recipients or the federal providers of federal financial assistance have the Title VI remedies. Section 505(a)(2) parallels the pre-1978 version of section 504's substantive prohibitions and does not include the language from section 504's contemporaneous amendment adding victims of discrimination by federal agency programs and activities to section 504's protection
 This incongruity between section 504's substance and section 505's remedy appears to have occurred because the conference committee adopted the House' section 504 amendment and the Senate's section 505 version without adding section 504's additional coverage to section 505's remedy provision. Congress intended, however, to extend section 504's reach to ensure that no one would be exempt from its nondiscrimination provisions. See infra section III.C. Section 505's remedy therefore must be available to victims of discrimination by federal agencies in their programs and activities brought within section 504's umbrella by the 1978 amendment. Section 505(b) in fact contemplates enforcement for all of the substantive rights in Title V (attorney's fees provision for "any action or proceeding to enforce or charge a violation of a provision of [Title V]"). The government in its brief appears to concede section 505's applicability to all section 504 violations.
 Our analysis would not change, however, even if we did not conclude that section 505 must cover all violations of section 504. Congress was aware that section 504 provided an implied private right of action. Yet Congress did not eliminate this remedy but rather enforced it by adding section 505. We see no congressional intent to abolish the private right of action and every intent to reinforce it. As we explain later in our opinion, there is no evidence that Congress intended to distinguish between the remedy for the new element of section 504 and the remedy for other violations of the section.
 
 
 [14]
 Although Doe has sued individuals only, he has sued the Attorney General of the United States and the Director of the Federal Bureau of Investigation in their official capacities. We construe his suit against them as a suit against the federal entities they represent. Gilbert v. DaGrossa, 756 F.2d 1455, 1458 (9th Cir.1985)
 
 
 [15]
 We note parenthetically that focusing on Cort 's second factor and determining legislative intent implicitly requires us to look at Cort 's other factors. For Congress to have intended to create a private right of action, it must necessarily have meant to enact the statute for the benefit of the plaintiff class, the right of action must be consistent with the statute's purposes and scheme, and the right of action certainly will be traditionally federal. Cf. Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488-89, 61 L.Ed.2d 82 (1979) (Cort second factor is the central inquiry, with the others traditionally relied upon in determining legislative intent)
 
 
 [16]
 "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, ... or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
 
 
 [17]
 We accept on its face the First Circuit's characterization of the government's role as regulator in Cousins's case. We note, however, that we allowed a section 504 plaintiff seeking an injunction that would require a government defendant to issue regulations under section 504 to proceed in federal court, without government challenge. Williams v. United States, 704 F.2d 1162, 1162 (9th Cir.1983). The Seventh Circuit also found a Title VI violation in the Department of Housing and Urban Development's actions as a provider of financial assistance in Gautreaux v. Romney, 448 F.2d 731, 737-41 (7th Cir.1971)
 
 
 [18]
 The dilemma in Cousins resulted from the incongruity between section 504's substantive laws and section 505's remedy provision. See supra p. 787 n. 13. Section 505 does not specifically address a situation like Cousins's or Doe's, where the discrimination does not occur in a financially-assisted private activity but in an activity operated by the federal government itself. The First Circuit nevertheless agreed that a cause of action existed against the government pursuant to section 504, but under the APA
 
 
 [19]
 The Seventh Circuit also distinguished between the discriminator and the administrator in Salvador v. Bennett, 800 F.2d 97, 99 (7th Cir.1986) (no private right of action against Secretary of Education for not investigating plaintiff's allegation more completely that university had violated section 504)
 
 
 [20]
 The pattern was to provide that no person could "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," whether on the basis of handicap in section 504, sex in Title IX, or race in Title VI
 
 
 [21]
 The district court had held that the doctrine of sovereign immunity applied to bar part of plaintiffs' suit. The defendant abandoned sovereign immunity, however, as a ground for affirmance on appeal. 448 F.2d at 733, 735. The plaintiffs had alleged a Fifth Amendment violation in addition to making their Title VI claim, and the opinion does not indicate whether defendant claimed sovereign immunity as to both or only one of these claims. The court does note that the doctrine would not protect the defendant because it "does not bar a suit such as this which is challenging alleged unconstitutional and unauthorized conduct by a federal officer." Id. at 735. Plaintiffs sued the Secretary, however, in his official, not individual capacity
 
 
 [22]
 We can draw no conclusions from Williams v. United States, 704 F.2d 1162 (9th Cir.1983), as to whether section 504 provides a private right of action against the government for money damages. The plaintiffs in Williams, handicapped individuals and organizations dedicated to improving the quality of life for the handicapped, sought an injunction directing the United States Post Office to issue the regulations required by the 1978 amendment to section 504(a). The Post Office's challenge to the plaintiffs' standing failed. Id. at 1163. The defendant did not challenge the courts' jurisdiction to hear the case, and the opinion does not address it
 
 
 [23]
 Even within the constellation of issues related to AIDS, all of which are relatively new and developing, the question of transmissibility from health care providers to patients is particularly unexplored, and views on the issue have been shifting in the past year following the discovery that a Florida dentist probably infected several of his patients. The American Medical Association and American Dental Association have recently reversed longstanding policy and declared that health-care workers infected with HIV, the virus that causes AIDS should disclose their infection to their patients before performing invasive procedures. Schulman, Stigma, Risk and the Florida AIDS Dental Cases, L.A. Times, June 2, 1991, at 2, col. 1. However, many other profession groups, including the New York State Department of Health and the California Medical Association object to the change in policy based on transmission by a single practitioner. Id
 At the time of the challenged actions, the Center for Disease Control Guidelines noted that "[a]lthough transmission of HIV from infected health-care workers to patients has not been reported, transmission during invasive procedures remains a possibility." Center for Disease Control, Recommendation for Prevention of HIV Transmission in Health-Care Settings, Morbidity & Mortality Weekly Report Supplement, Aug. 21, 1987, at 5-6 [hereinafter CDC Guidelines]. See also Estate of Behringer v. Medical Center at Princeton, 249 N.J.Super. 597, 592 A.2d 1251 (Law Div.1991) (finding substantially justified a hospital's policy requiring HIV-infected surgeon who performed invasive procedures on mucous membranes to obtain informed consent of his patients or not perform surgery and noting that "[w]hile the debate will rage long into the future as to the quantifiable risk of HIV transmission from doctor to patient, there is little disagreement that a risk of transmission, however, small, does exist.... In quantifying the risk, one must consider not only statistical data, but the nature of the procedure being performed.")
 
 
 [24]
 Doe has alleged discrimination against a federal agency that was not his employer. Any unlawful discrimination that may have occurred, however, was based on the FBI's conclusion that Doe's handicap prevented him from doing his job satisfactorily. We therefore must consider whether Doe was otherwise qualified to do that job, i.e., routine physical examinations
 
 
 [25]
 A handicapped person not otherwise qualified still receives section 504 protection from discrimination if a reasonable accommodation by the discriminator will enable the employee to perform the job functions. Id. at 287 n. 17, 107 S.Ct. at 1131 n. 17
 
 
 [26]
 In Chalk, 840 F.2d at 704-08, our circuit applied precisely this framework in reviewing and reversing a district court's denial of a preliminary injunction reinstating a teacher with AIDS who had been removed from the classroom
 
 
 [27]
 We find the latter argument regarding confidentiality unpersuasive. A confidential telephone call to the CDC, Surgeon General or other public health official, in which Dr. Doe's identity need not have been disclosed, could have yielded substantial information to assist Agent Held in his decisionmaking, without any risk of a breach of confidentiality
 
 
 [28]
 For example, at the time of the challenged actions, the CDC Guidelines recommended that "[h]ealth-care workers who have exudative lesions or weeping dermatitis should refrain from all direct patient care ... until the condition resolves," CDC Guidelines at 6, indicating that health care workers with such conditions pose a different risk of transmission than those without. Had Held presumed the worst scenario in order to make his risk assessment, i.e., that Doe had exudative lesions, Doe might well have complained of the lack of an individualized inquiry into his condition and how it affected his qualifications to perform the examinations
 
 
 [29]
 We do not hold that Held's actions were not a violation of section 504. We make no determination as to whether Dr. Doe was otherwise qualified to perform routine physical examinations. We also make no determination as to whether the FBI discriminated against Dr. Doe because he had AIDS, or whether the FBI discriminated against Dr. Doe because he refused to disclose information necessary to determine if he was "otherwise qualified" for his job. We hold only that a reasonable official could have believed Agent Held's actions to be lawful since there was a "legitimate question" as to whether they violated Doe's rights under section 504